678 S.W.2d 214 (1984)
PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellants,
v.
PEDERNALES ELECTRIC COOPERATIVE, INC., Appellee.
No. 14024.
Court of Appeals of Texas, Austin.
September 12, 1984.
Rehearing Denied October 24, 1984.
*215 Mike Willatt, Austin, for Lakeway Company.
Jim Mattox, Atty. Gen., Austin; Fernando Rodriguez, Asst. Atty. Gen., Austin, for Public Utility Commission.
Barry Bishop, Clark, Thomas, Winters & Shapiro, Austin, for appellee.
Before PHILIPS, C.J., and POWERS and BRADY, JJ.
POWERS, Justice.
The Public Utility Commission appeals from an order of the district court granting an injunction pendente lite on the application of Pedernales Electric Cooperative, Inc. in its suit against the Commission seeking permanent injunctive and declaratory relief. We will reverse the order of the district court and dissolve the injunction.

THE CONTROVERSY
In its original petition filed in district court, Pedernales alleged that it is a public utility subject to regulation by the Commission under the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (1980 & Supp.1984). More precisely, Pedernales is a cooperative selling electricity to its members or customers. In 1982 the rates charged by Pedernales for electricity had not been fixed by any action of the Commission. Rather, the rates had been unilaterally established and implemented by Pedernales independent of the *216 Commission, a body created by the Legislature in 1975 and given jurisdiction over public utility rates commencing September 1, 1976.
On July 30, 1982, the Commission opened a formal inquiry into the "practices" employed by Pedernales in billing its customers for electricity sold to them. The proceeding was given "Docket No. 4627" and culminated in an agreed order under the terms of which Pedernales was required to make specified changes in its billing practices. Pedernales alleged that "it was understood and contemplated by the parties" that Pedernales would sustain a loss in revenue as a result of the changes ordered by the Commission and, in consequence, that Pedernales would apply to the Commission "for interim and permanent rate relief."
Accordingly, in April, 1983 Pedernales initiated in the Commission a proceeding aimed at increasing the rates at which its electricity could be sold. The proceeding was given "Docket No. 5109." Contemporaneously with the filing Pedernales moved that the Commission, under authority of PURA § 43(d), establish temporary rates to be effective pending a final hearing in Docket No. 5109. On May 16, 1983, the Commission's hearing examiner conducted an evidentiary hearing relative to Pedernales' motion that the agency establish such temporary rates. Pedernales introduced evidence that it would, as a result of the Commission's earlier mandate that Pedernales change its billing practices, incur in the coming year a "negative cash flow" amounting to 2.8 million dollars; and, unless the Commission promulgated temporary rates sufficient to restore that sum to Pedernales, Pedernales argued, it would have to defer the construction of new facilities necessary to maintain existing services at peak periods and supply new customers; reduce its equipment inventory, with an adverse effect on maintaining existing service and supplying new service; delay operational and maintenance expenditures with an adverse effect on the quality of its service; and defer paying its creditors. Pedernales pointed out that these ill effects were not in the public interest and, in any event, any excessive charges resulting from the temporary rates could be made ultimately subject to refund to Pedernales' customers after the utility's rates were finally established. Answering the complaint of opposing parties, Pedernales pointed out that 81.8% of its annual expenses were, under the evidence, not discretionary and could not be postponed; and that any quarrel with the reasonableness of other expenses (1) involved expenses that were de minimis and (2) failed to take account of the fact that the remaining portion of Pedernales' expenses were practically non-discretionary, being for such requirements as salaries, insurance, fuel for motor vehicles, and customer billing expense.
The hearings examiner applied to Pedernales' motion and evidence a rule-based standard that a utility, to establish a prima facie case justifying the establishment of temporary rates, must show that without additional revenues (1) it will be unlikely to pay its current, reasonable cash operating expenses and (2) it will be unlikely to continue operating during the pendency of the rate proceeding.[1] The examiner concluded *217 that under this standard Pedernales failed to make a prima facie case because
[i]t did not show what current cash operating expenses would be in the interim, did not show that the test year expenses would ... be reasonable, did not show that it would be unable to pay any reasonable cash operating expenses during the pendency of the case, and did not show that it would be unlikely to be able to continue operating in the interim without emergency rate relief.
The examiner rejected Pedernales' contention that a "negative cash flow" was the proper and customary standard for establishing the need for temporary rates. The examiner, rejecting that standard, "denied" Pedernales' motion for temporary rates. Pedernales "appealed" to the Commission from the examiner's decision. The Commission sustained the examiner's action.
Pedernales thereafter filed in a district court of Travis County the suit wherein was issued the interlocutory order we now review. In its petition, Pedernales alleged that the residuum of its rates, permitted to be charged after the requisite changes in its "billing practices," were unconstitutional and confiscatory in that they failed to supply sufficient revenue to cover the utility's operating and maintenance expenses plus a return on its invested capital; that the utility would be forever barred from collecting the difference between the rates resulting from the agreed order and a reasonable and just rate set by the Commission after final hearing; and that the utility had no adequate remedy at law. Based upon these allegations, Pedernales requested an injunction pendente lite as well as permanent injunctive relief against the Commission's enforcement of any rate against Pedernales until such time as the Commission establishes a system of final rates in Docket No. 5109.

THE TRIAL COURT'S INTERLOCUTORY ORDER
After an evidentiary hearing, the trial court entered its order to the following effect, effective pendente lite:
1. The Commission is enjoined from enforcing against Pedernales any rate schedules or tariffs relative to Pedernales' sale of electricity; provided, however, Pedernales may not charge for its electricity any rates in excess of those requested in its application for rate relief in Docket No. 5109.
2. The Commission may proceed to a final hearing and determination of Pedernales' "rate request" in Docket No. 5109 and may enter therein "an interim rate order in accordance with the findings set out in this temporary injunction...."
The "findings" so referred to in the trial court's interlocutory order are evidently the "reasons" upon which the order is based, as stated therein:
1. The reduced rates presently being charged by Pedernales under the Commission's order in Docket No. 4627 "will not produce sufficient revenues to meet [Pedernales'] current operating and maintenance expenses, and produces [sic] no revenues to provide a reserve for depreciation and provides [sic] no return to [Pedernales'] investment in its utility plant and property";
2. Pedernales "timely requested an interim rate from the [Commission] but the requested interim rate was denied, and [Pedernales] has exhausted all administrative remedies before the [Commission] and has no right to an administrative appeal of an interim order under the law";
3. Pedernales "has demonstrated a reasonable probability that it will prevail on the merits and obtain rate relief";
4. The loss or damage occasioned to Pedernales "by reason of the present rates is irreparable, in that there is no legal remedy to permit recovery of such loss, and the Commission has a policy of not relating back rates to permit recovery of such loss or damage";
5. Pedernales' "customers can be adequately protected by a bond to insure them against loss occasioned by this Order." *218 From all of the foregoing, the trial court concluded
that these facts amount to unconstitutional confiscation of [Pedernales'] property and that the Public Utility Regulatory Act requires that [Pedernales] be allowed to charge rates which provide sufficient revenues to cover operating expenses and maintenance expenses and to provide a reserve for depreciation and a reasonable return upon its investment, and that it has jurisdiction to enter this Order, and that a Temporary Injunction should be entered.
The relief granted in the court's interlocutory order was expressly conditioned upon Pedernales' filing with the clerk of the trial court a bond in the amount of $1,000,000, conditioned upon Pedernales' observance of the terms of the order and upon its refunding to its customers
any amounts received by [Pedernales] in payment of bills rendered after entry of temporary injunction to the extent such amounts are found ultimately to be in excess of the lawful and proper rate therefor, and that [Pedernales] will pay all sums of money and costs that may be adjudged against it if the temporary injunction entered herein shall be dissolved in whole or in part.

HOLDINGS AND DISCUSSION
The present appeal poses the question of when, and upon what conditions, may a district court grant equitable relief from an administrative agency's interim order in a statutory proceeding of which the agency has undisputed jurisdiction. Many of the authorities cited to us are not in point because they involve injunctions pendente lite issued by a reviewing court on acquiring statutory jurisdiction of a suit for judicial review of an agency's final decision. See, e.g., Southwestern Bell Tel. v. Public Utility Com'n, 571 S.W.2d 503 (Tex.1978); Railroad Com'n. of Texas v. Lone Star Gas Co., 656 S.W.2d 421 (Tex.1983); Southwestern Bell Tel. v. Public Utility Com'n., 615 S.W.2d 947 (Tex.Civ.App. 1981), writ ref'd n.r.e. per curiam, 622 S.W.2d 82 (Tex.1981).
Pedernales' position is essentially as follows: The change in "billing practices" mandated by the Commission (in the agreed order in Docket No. 4627) effectively reduces the rates Pedernales may charge for its electricity, in comparison with the rates previously and independently set by the utility and charged by it before the Commission instituted the inquiry referred to above. These reduced rates, effective during the period preceding final decision in Docket No. 5109, are confiscatory and unconstitutional in that they deprive the utility of a reasonable return upon its property for that period of time. Pedernales' administrative remedy is inadequate, and its loss irreparable, because the Commission as a matter of policy invariably refuses to make retroactive any presumably higher and non-confiscatory rates determined after final hearing, even though the Commission has authority and discretion to do so, as stated in Railroad Com'n. of Texas v. Lone Star Gas Co., supra. See Prendergast v. New York Teleph. Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923) (temporary rates set by order of agency may be enjoined, where confiscatory, pending continuance and completion of the ratemaking process where no early date had been set for final hearing); Smith v. Illinois Bell Teleph. Co., 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926) (property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by express affirmance of the rates; and the utility may seek injunctive relief against continuance of confiscatory rate in force).
The Commission rejoins that the district court lacked jurisdiction to interfere with the agency's rate-making proceeding by the injunction order; that Pedernales' suit for injunction is a collateral attack upon the Commission's final order in Docket No. 4627; that the trial court abused its discretion in issuing the injunction order based upon a finding that Pedernales would suffer a confiscation of its property pending final hearing in the Commission; and that *219 the trial court abused its discretion when it overruled the Commission's motion for continuance.
We deal then with the equitable remedy of injunction, interposed by the district court to prevent an irreparable injury alleged to be the consequence of the Commission's overruling of Pedernales' motion that the agency establish temporary, nonconfiscatory rates pending completion of the rate-making proceeding in Docket No. 5109. Several judicial doctrines, and their underlying policies and purposes, are in these circumstances interwoven with various statutory and constitutional provisions and their underlying policies and purposes. The first judicial doctrine is that which requires one to exhaust his administrative remedies before one may successfully invoke judicial intervention in an on-going administrative proceeding. Texas State Board of Examiners in Optometry v. Carp, 343 S.W.2d 242 (Tex.1961). The second judicial doctrine involves a familiar element of injunctive relief, to the effect that a court will not order such equitable relief in the absence of irreparable injury; or, stated otherwise, the applicant for such relief must have no adequate remedy at law before he may successfully obtain injunctive relief. Additionally, there is involved the statutory rule that the jurisdiction given district courts to review the actions of administrative agencies in contested cases is ordinarily limited to the review of their final decisions. Tex.Rev.Civ.Stat. Ann. art. 6252-13a, the Texas Administrative Procedure and Texas Register Act (APTRA), § 19(a) (Supp.1984); PURA §§ 69, 70, 85.[2] And because of the nature of the injury claimed by Pedernales, there is raised the constitutional issue of whether Pedernales will be deprived of property without due process of law if denied the injunctive relief it sought and obtained from the district court. U.S. Const.amend. XIV; Tex. Const.Ann. art. I, § 19 (1955).
Requiring one to exhaust his administrative remedies is a doctrine well-established in administrative law. Texas State Board of Examiners in Optometry v. Carp, supra. The doctrine is applied in a number of different situations and is subject to numerous exceptions. For example, a district court may exercise its equity powers to enjoin the enforcement of a rate-fixing ordinance that is attacked on the ground that the rates fixed therein are confiscatory, where the ordinance became effective on its enactment and was promulgated without the notice and hearing required by due process of law. Glen Oaks Utilities, Inc. v. City of Houston, 161 Tex. 417, 340 S.W.2d 783 (1960) (injunction pendente lite properly issued in such circumstances, restraining enforcement of the rates fixed in the new ordinance until a final judicial determination of whether those rates were confiscatory). In such instances, there is an inherent right to resort to the district court and the court has inherent power to protect the utility's property. Id. Similarly, one need not await the *220 final determination of an agency proceeding when the agency acts in excess of its statutory authority. Westheimer Independent School District v. Brockette, 567 S.W.2d 780 (Tex.1978); Southwestern Bell Tel. v. Public Utility Com'n., 618 S.W.2d 130 (Tex.Civ.App.1981), opinion vacated as moot, 623 S.W.2d 316 (Tex.1981). A correct application of the exhaustion doctrine in specific circumstances depends upon a balancing of the underlying purposes of the doctrine against the injury claimed by the applicant for relief in equity, in the context of the particular administrative scheme where the exhaustion doctrine is invoked.[3]McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).
There is an important corollary to the exhaustion doctrine. The doctrine comes into effect only if the administrative remedy is realistically adequate to protect the asserted claim. One is not compelled to exhaust an administrative remedy that is inadequate or that is insufficient fully to protect against the injury alleged by the applicant for injunction. In the present context, as mentioned above, it has been held in rate cases that any administrative remedy is inadequate if it will not give protection to the utility's constitutional claim of confiscation resulting from the enforcement of rates that are too low, if final determination or approval of a rate is prolonged for an unreasonable period of time. Prendergast v. New York Teleph. Co., supra; see also Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923).
It is obvious that the purposes underlying the exhaustion doctrine are also the purposes designed to be served by the statutory rule that limits the jurisdiction granted district courts in APTRA § 19(a), that is, the court's jurisdiction is limited to reviewing "final decisions" by State agencies in "contested cases."[4] There is in APTRA *221 and PURA nothing which provides that the Commission's decisions on preliminary matters are not reviewable and we should hesitate to construe any statute as evidencing a legislative intent to exclude from judicial review, under a court's equity power, all preliminary decisions by an agency in all circumstances. Rather, we should assume an intent by the Legislature that APTRA and PURA are to operate in the context of the general decisional rules pertaining to the proper relationship of courts and agencies. Jaffe, Judicial Control of Administrative Action, Ch. II, at 426 (1965). (Otherwise, there would arise, for example, the issue of whether such a statute is unconstitutional as being an attempt to deprive the district courts of their inherent power to protect by injunction against the deprivation of property without due process of law.)
We turn then to the context made by the administrative scheme applicable to the present case wherein the doctrines of exhaustion and finality are invoked. McKart v. United States, supra.
The Commission is empowered to fix and regulate the rates of public utilities, such as Pedernales, in accordance with PURA. PURA § 37. A public utility intending to change its rates must file with the Commission a statement of intent in that regard, specifying in detail the proposed changes, the effective date thereof, and other required matters. PURA § 43(a). The Commission is required to hold a hearing in every case where the proposed change would constitute a "major change" in rates, as that term is defined in PURA § 43(b). After such hearing, the Commission is required to determine and fix the rates to be applied by the utility in the event the Commission finds that the rates intended by the utility are unreasonable or in any way in violation of any provision of law. PURA § 43(f).
After a public utility files a statement that it intends to implement a schedule of rate changes that are major, it is possible for a system of temporary rates to be implemented if the Commission suspends the intended schedule of new rates for a stated period beyond the date the utility intended them to be effective. The Commission may itself, in its discretion, choose to establish a system of temporary rates during the suspension period. PURA § 43(d). (Pedernales apparently invoked this power of the Commission by the utility's motion in the present case). Or, the utility may unilaterally elect to implement a system of temporary rates selected by it, provided these are not in excess of its intended new rates. It may do so on the filing of a bond in a form and having sureties approved by the Commission, subject to a duty to refund any excess resulting from the Commission's final rate decision. PURA § 43(e).[5]
*222 The statutory scheme for the determination of utility rates is complex; the subject matter is highly technical and dependent upon agency discretion in various matters. See, e.g., PURA §§ 38-41; Southwestern Bell Tel. v. Public Utility Com'n, supra, 571 S.W.2d at 512-16. In such circumstances, the factor of administrative autonomy looms very large indeed.[6]
In this statutory framework, we must consider whether Pedernales required injunctive relief to prevent irreparable and unconstitutional injury to its property rights.
We are compelled to conclude that any loss sustained by Pedernales in the present circumstances, as a result of the Commission's action in refusing itself to implement a system of temporary rates, is properly considered not as a violation of the utility's constitutional rights, if the rates are indeed "confiscatory," but as a necessary incident of rate regulation so long as Pedernales is not forced to charge the "confiscatory" rates for an unreasonable length of time. Maintenance of existing rates in force for a reasonable period of time pending a final hearing is a reasonable and constitutional limitation upon Pedernales' property rights. Hope Natural Gas Co. v. Federal Power Commission, 196 F.2d 803 (4th Cir.1952); Railroad Com'n. of Texas v. Lone Star Gas Co., supra. It is not suggested that the time periods involved in the present case are unreasonable; indeed, Pedernales has not proceeded upon that theory but solely upon the theory that it is deprived unconstitutionally of its property right to a return by a requirement that it operate for any period of time under confiscatory rates. We believe, however, that an unconstitutional deprivation does not occur until the expiration of a reasonable time, the "lag" in the rate-making process being "inherent" therein and "an element of the risk associated with investment in a utility." Railroad Com'n. of Texas v. Lone Star Gas Co., supra at 425. In our view, the Commission was entitled to a reasonable period of time, during the progress of the rate proceeding, to be free of judicial interference and before it was obligated to (1) reach a final determination on Pedernales' rate proceeding or (2) order implementation of a system of interim rates in absence of a final determination. A reasonable time *223 had not expired at the time injunctive relief was ordered in the present case.[7]
If we be mistaken in the foregoing, however, injunctive relief was nevertheless unwarranted in the present case because the injury claimed by Pedernales does not justify judicial subordination of the purposes underlying the exhaustion doctrine in the facts shown by the evidence adduced in the present case.
In light of PURA § 43(e), Pedernales cannot be said to be without a realistic remedy, for the relief available to it under that section is for all practical purposes the same relief it obtained in district court as a consequence of the injunction pendente lite. Moreover, it would be intolerable if utilities regulated by the Commission may routinely ignore the self-help remedy provided by PURA § 43(e), when the Commission refuses in its discretion to establish temporary rates under PURA § 43(d), and obtain from a district court essentially the same remedy, with a bond set by the court, in a form prescribed by the court, and with sureties approved by the Court, instead of permitting the Commission to exercise its powers in these matters as contemplated by PURA § 43(e). (We assume 90 days had elapsed between the effective date of Pedernales' intended new rates and the date the utility filed suit for judicial review of the Commission's interim order. See footnote 7).
But what of Pedernales' contention, and the district court's finding, that the Commission routinely refuses, as a matter of policy, to make any final rates retroactive, thereby depriving Pedernales of a just and fair return pending the Commission's final decision, with a corresponding deprivation of property, without due process of law, at least for the interim period?[8] We think this issue decided by the holding in Railroad Com'n. of Texas v. Lone Star Gas Co., supra. But in addition, one must consider that rate making for utilities is not an exact science. It operates largely upon historical data that changes as economic conditions change. While in the present case Pedernales may, as we have assumed, suffer a detriment as a result of regulatory "lag," in other circumstances the "lag" may work to Pedernales' benefit. The losses of one rate period may well be counterbalanced by the gains of another period. It is in this light that we must view Pedernales' invocation of the trial court's equity power as measured against the purposes of the exhaustion and finality doctrines. Where, as here, there had been no unreasonable delay by the Commission in reaching a final decision, we cannot say that Pedernales' evidence showed that its claim of injury outweighed the purposes underlying those doctrines.[9]
*224 We hold that the trial court abused its discretion in issuing the injunction pendente lite. The injunction order is reversed and the injunction pendente lite is dissolved.
NOTES
[1] The Commission's former rule 052.01.00.040, entitled "Requests for Interim Rate Relief." The rule provided that the utility shall have the burden of proof

to establish that without additional revenues it is unlikely it will be able to pay its current, reasonable cash operating expenses and continue operating during the pendency of its rate proceeding.
Moreover, it was provided that nothing in the rule
should be read to preclude the commission or the hearings examiner from granting interim rate relief on the basis of mutual agreement of all parties ... or upon a showing of good cause by the utility, in lieu of meeting the above standards. Such interim rates may be conditional upon an obligation to refund all or a part thereof, upon final order or such other conditions as the commission or the examiner may deem appropriate.
The rule was adopted October 1, 1982 and effective at the times material to the present dispute. The rule was altered somewhat and adopted anew on November 4, 1983 utilizing a different classification system. It may now be found at 16 TAC § 21.84.
[2] Section 69 of PURA provides for judicial review in very broad and general terms:

Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule. The commission shall be a party defendant in any such proceeding represented by the attorney general.
Section 70 deals with costs and attorney's fees. PURA § 85 provides:
During the pendency of an appeal, the district court, the court of civil appeals, or the supreme court, as the case may be, may stay or suspend, in whole or in part, the operation of the regulatory authority order, ruling, or decision and such courts in granting or refusing a stay or suspension, shall act in accordance with the practice of courts exercising equity jurisdiction.
While the foregoing provisions, particularly § 69, could be literally construed, perhaps, to permit judicial review of an interim order issued by the Commission, we cannot believe the Legislature so intended. See Sun Oil Company v. Railroad Commission, 158 Tex. 292, 311 S.W.2d 235 (1958); Sproles Motor Freight Line v. Smith, 130 S.W.2d 1087 (Tex.Civ.App.1939, writ ref'd). PURA was enacted after APTRA and the judicial review provisions of the former must be interpreted in light of APTRA § 19(a) and the limitation imposed therein relative to "final decisions." PURA§ 69 must, for a more practical reason, be construed to encompass only final decisions by the Commission. If the Commission's interim orders are all subject to judicial review, the agency could not as a practical matter perform the duties assigned it under PURA.
[3] The central purposes ordinarily attributed to the exhaustion doctrine are as follows: (1) preventing premature interruption of the administrative agency's duty of applying the regulatory statute to the facts of the specific case under consideration, wherein there may be important or even controlling issues that depend for their proper resolution on the application of administrative discretion, expertise, experience, policy, or other factors with respect to which the court may be entirely unaware or incompetent to handle; (2) avoiding the improvident expenditure of judicial time and resources in the resolution of preliminary disputes that may be resolved or become immaterial or insignificant in light of later developments in the administrative process; (3) assuring a proper respect for the role and authority of the administrative tribunal by giving it a chance to correct its own errors, thereby discouraging parties from frequent and deliberate disregard of the administrative process with the undermining of agency effectiveness that will attend such disregard. McKart v. United States, supra; Jaffe, Judicial Control of Administrative Action, Ch. II, at 424-25 (1965). Of course, the underlying logic of these purposes may occasionally permit judicial intervention in an on-going administrative proceeding. For example, resort to a court might dispose of the controversy without further administrative proceedings or a subsequent suit for judicial review of the agency's final order, as when the agency has embarked upon a proceeding wherein it has no authority to act at all with the result that any action taken by it will be void. Westheimer Independent School District v. Brockett, supra.
[4] The Supreme Court of Texas has drawn a useful distinction in Big Three Industries, Inc. v. Railroad Com'n. of Texas, 618 S.W.2d 543, 546-47 (Tex.1981):

There are at least two kinds of non-final administrative orders. The first are interim orders, which by their terms are to be superseded by a final order. These interim orders are not appealable. City of Corpus Christi v. Public Utility Commission, 572 S.W.2d 290 (Tex.1978); City of Corpus Christi v. Public Utility Commission, 569 S.W.2d 494 (Tex. 1978); Lower Colorado River Authority v. Coastal States Gas Producing Co., 551 S.W.2d 340 (Tex.1977). These cases involve interlocutory orders intended to be effective only until the final order.
* * * * * *
The second group of administrative orders is expressly subject to, conditioned upon or contingent upon resolution of another matter. Mahon v. Vandygriff, 578 S.W.2d 144 (Tex.Civ. App.Austin 1979, writ ref'd n.r.e.); Walker Creek Homeowners Association of Ellis County v. Texas Department of Health Resources, 581 S.W.2d 196
In Big Three Industries, Inc., the Supreme Court held the administrative order reviewable as a final order because nothing therein recited that any future action would be taken; the order made no provision for refunds pending further action; and, the order did not recite that it was either an interlocutory or interim orderall in contrast to the terms of the orders in the Corpus Christi and Lower Colorado River Authority cases. In the present case, the very issue of interim rates, and the resulting administrative order set aside by the district court's injunction, leave no doubt whatever that the order is an interim order intended to be effective until final determination of Pedernales' rate proceeding.
[5] Sections 43(d) and (e) of PURA, as they existed at the time of the injunction order issued in the present case, provided the following statutory scheme for the establishment of temporary rates for the period following a utility's commencement of a rate proceeding by its filing a schedule of intended rates:

a. Pending a final hearing on the utility's intended rate schedule, the Commission was empowered to suspend implementation of the intended rate schedule for a period not to exceed 120 days beyond the date set by the utility for the rates to become effective. The Commission was also empowered to extend the period of suspension for an additional 30 days.
b. The Commission was empowered, in its discretion, to fix temporary rates for a period of suspension. If it did not do so, the rates in force when the suspended schedule was filed continued in force for the period of suspension.
c. If the commission failed to make a final determination within 90 days from the intended effective date of the intended rate schedule, the utility was entitled to put into effect "a changed rate, not to exceed the" rate proposed in its intended schedule of rates. It could do so, without any act on the part of the Commission, by filing a bond with the Commission, payable to it in an amount and with sureties approved by the Commission, "conditioned upon refund and in a form approved by the" Commission.
d. If the Commission failed to make a final determination within 150 days of the date the schedule was intended to become effective, the schedule was deemed approved by the Commission, subject to the authority of the Commission thereafter to continue a hearing in progress. In an amendment effective September 1, 1983, certain changes were made in §§ 43(d), (e). 1983 Tex.Gen.Laws, ch. 274, at 1258. The period of suspension was settled upon as 150 days and provision was made for extending the period for two days for each day of the actual hearing on the merits in excess of 15 days. Unfortunately, the first sentence of subsection (e) is rendered almost unintelligible by the amendment. We need not concern ourselves with it, however, for the order we now review was issued well before the effective date of the 1983 amendment.
[6] Judicial respect for the autonomy of administrative agencies is not merely a matter of judicial grace. The Legislature is not required to provide for judicial review of the actions of administrative agencies created by that body. The omission of the Legislature to provide for judicial review, or its denial of judicial review, will not invalidate the acts of the agency. City of Amarillo v. Hancock, 150 Tex. 231, 239 S.W.2d 788 (1951). And if judicial review is provided by the Legislature, even then the grant of jurisdiction is constitutionally circumscribed the reviewing court may not substitute itself for the administrative body and perform purely administrative acts. Id. The Legislature may not confer such power upon a court and thereby enlarge its jurisdiction beyond constitutional bounds. Fire Dept. of City of Fort Worth v. City of Fort Worth, 147 Tex. 505, 217 S.W.2d 664 (1949). A corollary constitutional principle is this: where the Legislature omits to provide for judicial review of the actions of an agency, or even where it positively denies judicial review of agency actions, those actions are nevertheless subject to judicial review if they violate a provision of the State or federal constitution, such as the prohibition against depriving one of property without due process of law. City of Amarillo v. Hancock, supra; Brazosport Sav. & Loan Ass'n. v. American Sav. & Loan Ass'n., 161 Tex. 543, 342 S.W.2d 747 (1961); Chemical Bank & Trust Co. v. Falkner, 369 S.W.2d 427 (Tex. 1963). Thus, the independence, predominance, and prerogatives of an agency operating within its alloted sphere are constitutionally insulated from judicial interference.
[7] Pedernales' pleadings in the present cause, included in the appellate transcript, and other materials in the transcript, reveal the following sequence of events:

April 1, 1983 The agreed order, with attendant changes in Pedernales' "billing practices," became effective.
April 1, 1983 Pedernales filed "a request for interim rate relief." The request was received by the Commission but not given a docket number "because permanent relief was not requested at the same time."
April 15, 1983 Pedernales "filed a complete rate filing package ... requesting a permanent rate increase and renewing the request for interim rate relief. That filing was given Docket No. 5109."
May 16-18, 1983 Evidence taken and argument considered relative to Pedernales' motion that the Commission establish interim rates.
May 23, 1983 Hearings examiner signed order denying Pedernales' request for interim rates.
May 27, 1983 Pedernales appealed to the Commission from the order of the hearings examiner.
June 13, 1983 Pedernales' appeal overruled by operation of law in absence of action by Commission.
June 14, 1983 Pedernales filed in district court its suit for permanent injunctive relief and application for temporary injunction.
June 24, 1983 Hearing held in district court on Pedernales' application for injunction pendente lite; trial judge signed order granting injunction pendente lite.
[8] We believe the evidence to be insufficient to establish the finding in question, as noted below.
[9] We assume that the schedule of new rates filed by Pedernales constituted "major changes" from the rates resulting from the Commission's final order in Docket No. 4627. Moreover, we assume that Pedernales intended the new rates to become effective some 35 days after Pedernales' filing of the intended rate changes. Finally, we assume that the Commission suspended the effective date intended by Pedernales. These assumptions are dictated by the nature of the suit brought by Pedernales. For example, if the effective date of the new rates was not suspended by the Commission, there would be no necessity for injunctive relief at all. See generally PURA § 43. If the Commission did suspend the effective date of the new rates, the agency was entitled to a 90-day period within which to hold a final hearing, according to PURA § 43(e). It is not suggested in the present case that the 90-day period is unreasonable. We assume its constitutionality as a "reasonable time" insofar as the present case is concerned. After the expiration of the 90-day period, Pedernales was entitled to implement unilaterally the system of temporary rates spoken of in PURA § 43(e), a legal remedy that is fully adequate in the circumstances.

We are compelled to notice that the nature of the case and the record in the present case compel the foregoing assumptions, for the record is devoid of any suggestion about the nature of the new rates intended by Pedernales, when the utility filed its statement, when the new rates were intended to become effective, and whether the Commission suspended that effective date. Indeed, the evidence adduced at the hearing on Pedernales' application for injunction pendente lite is extremely sparse. Aside from evidence relating to the issue of whether the Commission was entitled to a continuance, the documentary evidence consists solely in a copy of the interim order issued by the Commission and the penciled notes of Pedernales' witness Catherine Jones. (A copy of a letter tendered in evidence by Pedernales was never admitted insofar as the statement of facts indicates.) The testimonial evidence was given entirely by Catherine Jones who testified to the following effect:
1. She is a certified public accountant and an audit manager for an accounting firm. In her employment, she prepared for Pedernales the "rate filing exhibits" submitted to the Commission in connection with Docket No. 5109, based upon the books and records of Pedernales audited by another person.
2. The "rate filing exhibits" show that Pedernales will, in the year commencing May 1, 1983, sustain a "negative cash flow," a term she defined as indicating that a utility will "not have sufficient revenues coming in to meet their [sic] day-to-day operating expenses, and their [sic] interest and principal payments." In the year beginning May 1, 1983, if forced to continue charging the rates resulting from the Commission's order in Docket No. 4627, Pedernales will sustain a total "negative cash flow" of $3.2 million, $1.2 million of which will be sustained in August 1983. The amount of "negative cash flow" will vary from month to month and is dependent upon the weather to some extent.
3. A "negative cash flow" is not the same as an excess of "expenses over revenue" for the latter term encompasses expense items not paid in cash, such as depreciation, a bookkeeping item. When such items are included in the year's forecast, Pedernales will sustain a net loss of $4.6 million, in the year beginning May 1, 1983, if forced to operate at the lower rates resulting from the Commission's order in Docket No. 4627.
4. Pedernales will, under the lower rates, have no revenues available for cash expenditures, reserve for depreciation, return on investment, or capital improvements.
5. Ms. Jones was "not aware" of any rate proceeding in the Commission where the agency "related back" from the date of its final order any increased rates fixed by the agency or allowed to become effective as intended by the utility.
6. Pedernales was not in "default" so as to preclude it from obtaining loans from a government agency up to a maximum of $3 million. She did not consider, in arriving at her estimates, the certificates of deposit held by Pedernales in the apparent amount of half a million dollars.
The sketchy evidence adduced in the trial court hearing suggests that the trial court was on dangerous ground indeed in setting aside the Commission's rule designed specifically to fix the conditions upon which it will establish a system of temporary rates, and in issuing a temporary injunction based upon what the district court thought the proper test should be, that is, a "negative cash flow." The present record affords a patently insufficient basis upon which the trial court could declare invalid the agency's rule, as the court impliedly but unquestionably did. It could, in the state of the present record, do so solely on a theory that no regulatory "lag" time was permitted at all and a utility is entitled as a matter of constitutional right to charge a non-confiscatory rate each and every day; that is to say, that the Commission was not entitled to a reasonable time within which to make a final decision on Pedernales' schedule of intended rates. We believe this to be an erroneous view under Railroad Com'n of Texas v. Lone Star Gas Co., supra, and the other decisions mentioned in the text of this opinion.