SOUTHWESTERN BELL TELEPHONE
COMPANY, Appellant,

v.

The PUBLIC UTILITY COMMISSION
OF TEXAS, Appellee.

No. 3–86–108–CV.

Court of Appeals of Texas,
Austin.

Aug. 12, 1987.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellant.

Jim Mattox, Atty. Gen., Steven Baron, Asst. Atty. Gen., Austin, for PUC.

Jim Mattox, Atty. Gen., W. Scott McCollough, Asst. Atty. Gen., Austin, for State Purchasing & General Services Com'n.

Steve Bickerstaff, Bickerstaff, Heath & Smiley, Austin, for intervenors Amerisystems, Inc. and Realcom Communications Co.

Before POWERS, GAMMAGE and CARROLL, JJ.

POWERS, Justice.

Southwestern Bell Telephone Company appeals from a district-court judgment that dismisses for want of subject-matter jurisdiction the company's suit against the Public Utility Commission, in which numerous other litigants had intervened. We will affirm the judgment.

## THE CONTROVERSY

The Commission regulates "public utilities" through the agency's administration of the various statutory provisions that constitute the Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ.Stat.Ann. art. 1446c (Supp.1987). Bell holds a certificate of convenience and necessity issued by the Commission, under that statute, and falls within the agency's regulation with respect to the "telecommunications" services that Bell provides, including a kind of service known as "local exchange service."

The term "local exchange service" is not defined in PURA. It is, however, a determinant by which a "specialized communications common carrier" may be excluded from the statutory definition of "public utility" and thereby fall outside the scope of the Commission's regulation under PURA. If a "specialized communications common carrier" does *not* provide a "local exchange service" then it is not subject to PURA or the Commission's regulation. *See* PURA §§ 2 and 3(c)(2). The term "local exchange service" not being defined in PURA, the Commission exercised its rule-making power to define the term for regulatory purposes:

> *Local exchange service*—Telecommunication service provided within service areas in accordance with the local exchange tariffs. It includes the use of exchange facilities required to establish connections between customer access lines within the exchange and between customer access lines and the long distance facilities serving the exchange.

16 Tex.Admin.Code § 23.61(a)(18) (1986). Bell supplies local exchange service as a part of its general telecommunications system.

Bell learned that a variety of individuals and businesses had begun to install and utilize "switching systems" serving rather small and distinct areas within the geographical area assigned to Bell in its certificate of convenience and necessity. Through these "switching systems," a multitude of telephone users gained access to Bell's lines serving the individual or business that provided the system, and thence to Bell's general telecommunications system and the integrated network of which it is a part. For example, a landlord might install and maintain a "switching system" for the tenants in his large office building or complex, placing therein his own lines connecting his tenants' telephones to his "switching system" and thence to Bell's system to which the landlord subscribed. While akin to the switchboard in an ordinary office situation, these systems (sometimes referred to as "shared tenant systems") were distinctive in their greater magnitude and in the fact that the systems oftentimes included other services in addition to voice communications, such as word processing, security-voice mail, and environmental control. Concerning the greater magnitude of these systems, Bell alleged, for example, that one provider supplied the equivalent of 3,800 access lines, a magnitude of service that exceeded the access lines provided by 45 of the 71 telephone companies in the State that held certificates of convenience and necessity issued by the Commission and fell within its regulation.

The Commission rule, quoted above, does not clearly include these switching systems within its definition of "local exchange service." At the present time, the providers of switching systems are therefore not required to obtain from the Commission certificates of convenience and necessity, nor are they subject in any other way to the Commission's regulation of "public utilities." Bell petitioned the Commission to amend its rule defining "local exchange service" (and another rule) to make it plain that the "switching systems" amounted to

a "local exchange service," in order to bring those providing the systems within the PURA definition of "public utility" and thus within the Commission's regulation. *See* PURA §§ 2 and 3(c). The initiation of a rulemaking proceeding in this manner is authorized by the terms of the Administrative Procedure and Texas Register Act ("APTRA"), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 11 (Supp.1987).[1] The provisions of APTRA apply to the Commission to the extent they are not in conflict with the provisions of PURA. PURA § 4.

After completing the requisite public hearings, the Commission determined that it would not amend its rules in accordance with Bell's request. Instead, it invited Bell to have the relevant issues determined in a tariff-revision proceeding initiated by Bell. In a "final order" that terminated the rulemaking proceeding, the Commission set out the rationale upon which its decision was based:

1. In many cases, there were provided over the same lines word-processing, security-voice mail, and environmental-control services in addition to voice communication. These commingled services do not presently fall within the definition of "local exchange service" established by the Commission's rule even though the voice-communication element might do so standing alone.

2. Whether any particular system constitutes a "true utility service" falling within the Commission's regulation must be determined on a case-by-case basis after "examining the nature of the new service and determining whether it falls within the ambit of appropriate definitions of the PURA."

3. "The Commission is concerned about the impact these services might have on the local exchange telephone customers and, ultimately, the general body of ratepayers" who do not use the unregulated services. This administrative "concern" refers to the evidentiary showings made in the rulemaking proceeding initiated by Bell in support of its contention that regulated telecommunications utilities were required to install lines and other facilities that lay dormant and redundant to the extent "switching services" *were* provided by the unregulated individuals and businesses, but essential and required, nevertheless, in case the unregulated individuals and businesses *failed* or *ceased* to provide the equivalent of a "local exchange service." The redundant ("stranded") investment combined with the "shrinkage" in the customer base of the regulated telecommunications facilities "could lead to higher rates for" the great majority of telephone customers who did not utilize the unregulated services.

4. Bell's petition for amendment of the Commission's rules, in the proceeding under APTRA § 11, would be denied, but the company should develop and urge its contentions by "filing a ... proposed tariff which would address" the issues involved, such as "advance notice, planning for investment purposes, potential stranded investment and whether the [unregulated] service should be considered a discrete service for tariff purposes." The tariff-revision proceeding would be "the best vehicle to resolve the issues and make a determination as to whether the concerns voiced by [Bell] are valid."

Its request for an amendment of the Commission's rules having been denied, Bell filed its lawsuit in district court. In the company's first amended original petition, it set out the general controversy as we have outlined it above and complained of the Commission's decision not to amend its rules so as to bring the unregulated activities within the agency's regulation. Alleging that the unregulated activities injured Bell in its revenues, its investments, and in the rights and privileges conferred

1. Section 11 provides:
   Any interested person may petition an agency requesting the adoption of a rule. Each agency shall prescribe by rule the form for petitions and the procedure for their submission, consideration, and disposition. Within 60 days after submission of a petition, the agency either shall deny the petition in writing, stating its reasons for the denial, or shall initiate rulemaking proceedings in accordance with Section 5 of this Act.

by its certificate of convenience and necessity, the company requested that it have the following relief after final hearing in the district court:

1. A permanent injunction restraining "the Commission from refusing ... to enforce the provisions of PURA which require providers of local exchange telephone service to obtain certificates of convenience and necessity."

2. A writ of mandamus or other effective writ "directing the Commission to perform its duty to treat all those who provide local exchange telephone service as retail public utilities under [PURA § 49]."

3. A declaratory judgment to the effect that the activities of which Bell complains, as recounted above, "constitute the provision of retail public utility service within the meaning of PURA and the Commission's rules and therefore require such providers to obtain a certificate of convenience and necessity...."

4. "[A]n order reversing the act of the Commission in its final order in [the rulemaking proceeding initiated by Bell] and remanding this proceeding to the Commission for the entry of an appropriate order consistent with the judgment of this Court that [the] actions [in controversy] constitute the provision of a retail public utility service."

Bell's argument reduces to a claim that the trial court had jurisdiction to construe the Commission's rule (defining "local exchange service") so that it would include the "switching systems" described previously, and to require the Commission to enforce the rule accordingly. Bell concedes the text of the rule is ambiguous in this respect; and, it is undisputed that the Commission has refused to amend its rule, electing instead to determine on a case-by-case basis whether any particular "switching system" amounts to a "local exchange service." Bell makes an analogous claim concerning the PURA definition of "public utility" set out in PURA § 3(c).

### DISCUSSION AND HOLDINGS

Bell contends the trial court possessed subject-matter jurisdiction on various alternative grounds that we shall now consider.

■ *Uniform Declaratory Judgments Act.* This statute, found at Tex.Civ.Prac. & Rem.Code Ann. § 37.001 *et seq.* (1986), empowers a court of record to "declare rights, status, and other legal relations" on the prayer of "[a] person interested ... whose right, status, or other legal relations are affected by a statute...." *Id.*, §§ 37.-003 and 37.004. The statute creates a *remedy* that would not otherwise be available for a cause of action that already falls within the court's jurisdiction; it does not itself confer jurisdiction. *Crawford v. City of Houston,* 600 S.W.2d 891 (Tex.Civ.App. 1980, writ ref'd n.r.e.); *Marshall v. City of Lubbock,* 520 S.W.2d 553 (Tex.Civ.App. 1975, no writ); *see generally, California Products, Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780 (1960). Ordinarily, in the context of administrative proceedings, the court's jurisdiction under Uniform Declaratory Judgments Act has derived from its inherent power to hear and determine whether the agency action in controversy was ultra vires or unconstitutional. *See e.g., City of Sherman v. Public Utility Com'n,* 643 S.W.2d 681 (Tex.1983) (whether agency had statutory authority to regulate groundwater "development"); *Roskey v. Texas Health Facilities Com'n,* 639 S.W.2d 302 (Tex.1982) (whether certificate issued by agency was void for want of statutory authority to issue it); *Texas Liquor Control Board v. Canyon Creek Land Corp.,* 456 S.W.2d 891 (Tex.1970) (whether agency properly construed statutory term "Locker System," upon which depended the agency's power to enforce statute); *Schwantz v. Texas Department of Public Safety,* 415 S.W.2d 12 (Tex.Civ.App.1967, writ ref'd) (whether statute was constitutional in purporting to empower agency to suspend licenses of motor-vehicle operators); *see also, Public Utility Com'n v. Pedernales Elec. Coop.,* 678 S.W.2d 214 (Tex.App.1984, writ ref'd n.r.e.); *State Board of Insurance v. Deffebach,* 631 S.W.2d 794 (Tex.App.1982, no writ); *Texas State Board of Pharmacy v. Walgreen Texas, Inc.,* 520 S.W.2d 845 (Tex.Civ.App.1975, writ ref'd n.r.e.); and

*City of El Paso v. El Paso City Lines,* 227 S.W.2d 278 (Tex.Civ.App.1949, writ ref'd n.r.e.). Because the Uniform Declaratory Judgments Act does not itself confer jurisdiction upon the district court, we need not discuss it further in the present appeal.

■ *Inherent Jurisdiction.* Bell contends its pleadings invoked the inherent, original, equitable jurisdiction of the district court to protect against agency action that is ultra vires of the agency's constitutional and statutory powers and injurious to Bell's property right—specifically, the rights and privileges vested in the company by the terms of the certificate of convenience and necessity issued by the Commission to the company. It is indisputable that the district courts of the State possess such jurisdiction. *City of Houston v. Blackbird,* 394 S.W.2d 159 (Tex.1965); *Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427 (Tex.1963); *Glen Oaks Utilities, Inc. v. City of Houston,* 161 Tex. 417, 340 S.W.2d 783 (1960); *City of Amarillo v. Hancock,* 150 Tex. 231, 239 S.W.2d 788 (1951); *Southwestern Bell Tel. v. Public Utility Comm'n,* 618 S.W.2d 130 (Tex. Civ.App.), *vacated as moot,* 623 S.W.2d 316 (Tex.1981). But the property rights asserted, we must remember, arise and are held under and subject to the many statutory provisions that comprise PURA, including those that vest in the Commission the general power of regulation as well as specific powers pertaining to particular aspects of such regulation. In PURA § 18(b), the Legislature vested in the Commission, subject to limitations contained in the statute, *"exclusive original* jurisdiction over the business and property of all telecommunications utilities in this state" for the general purpose of "regulating [the] rates, operations and services" of such utilities and the particular purpose of adjusting and accommodating, according to the public interest, the various and sometimes conflicting legislative purposes that underlie PURA. (emphasis added). *See Amtel Communications v. Public Utility Comm'n,* 687 S.W.2d 95 (Tex.App.1985, no writ).

At trial, the parties would presumably adduce evidence showing the equipment and methods of operation employed by specific or typical providers of "switching systems" of various magnitude. Bell's pleadings would then require the district court to ascertain which should come within the rule-based definition of "local exchange service" and which should not; or, to ascertain, without reference to the rule, which should come within the PURA definition of "public utility" and which should not. Then, Bell's pleadings would require the court to fashion a norm or standard of general applicability, distinguishing between the included and excluded categories, and direct the Commission to enforce the distinction accordingly. This manner of proceeding, requiring the court to determine all the arguably relevant subsidiary matters that might be involved, would place in disarray the regulatory scheme established by the Legislature in PURA. We think such matters unquestionably lie within the exclusive jurisdiction of the Commission to determine initially. *Kavanaugh v. Underwriters Life Ins. Co.,* 231 S.W.2d 753 (Tex.Civ.App.1950, writ ref'd). *See also, Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891 (Tex.1970); *Foree v. Crown Central Petroleum Corp.,* 431 S.W.2d 312 (Tex. 1968); and *Gregg v. Delhi-Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411 (1961).

■ What then of the fact that Bell *invoked* the primary jurisdiction of the Commission in the rule-amendment proceeding initiated by the company, under APTRA § 11, and the Commission refused for specified reasons to determine therein the pertinent questions? The reasons given by the Commission have been set out above and it did not refuse absolutely to determine the questions. Rather, the Commission ruled that it would determine the pertinent questions on a case-by-case basis in the tariff-revision proceeding it invited Bell to initiate. The questions themselves manifestly and almost uniquely require the exercise of administrative discretion and the special knowledge, experience, and services of the Commission in determining technical and intricate matters of fact. We refer, for example, to the fact that voice-communication services are commingled in

some instances with other services that are not subject to the Commission's regulation. *Kavanaugh v. Underwriters Life Ins. Co., supra,* at 755. The Commission also possessed, in our view, the unquestionable discretion to elect between a rulemaking proceeding and a tariff-revision proceeding as the best proceeding wherein to determine the pertinent questions. Bell has not really attacked this exercise of discretion by the Commission nor has Bell contended that the tariff-revision proceeding chosen by the Commission will be inadequate for the purpose or injurious to Bell. The company simply suggests starkly that it *should not have the burden* of initiating that kind of a proceeding and the burden of establishing its contentions therein. We hold these are inadequate to justify judicial intervention on due-process grounds, by-passing the administrative process and the duties committed to the Commission under PURA. *Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1943); *Public Utility Comm'n v. Pedernales Elec. Co-op., supra; see also, Texas State Board of Examiners in Optometry v. Carp,* 162 Tex. 1, 343 S.W.2d 242 (1961). The pertinent questions being committed to the initial determination of the Commission, by their very nature and the statutory scheme involved, we hold the Commission's decision not to decide those questions in a rulemaking proceeding does not deprive the primary-jurisdiction doctrine of the force and effect it would ordinarily have.

■ *Jurisdiction under APTRA § 12.* Bell contends the trial court had subject-matter jurisdiction of its claims under the provisions of APTRA § 12. That statute empowers the district courts of Travis County to determine "[t]he validity or applicability of any rule ... if it is alleged that the rule, or its threatened application, interferes with or impairs, ... the legal rights or privileges of the plaintiff," or threatens to do so. The statute is derived from § 7 of the Model State Administration Procedure Act (1961). *See generally,* Watkins & Beck, *Judicial Review of Rulemaking Under the Texas Administrative Procedure and Texas Register Act,* 34 Baylor L.Rev. 1 (1982). The jurisdiction given in APTRA § 12 to the Travis County district courts is an *original* jurisdiction, and not an "appellate" jurisdiction such as that contemplated by PURA §§ 69 and 85 and APTRA § 19, discussed below.[2] Thus, the primary-jurisdiction doctrine applies to litigation brought under APTRA § 12 (such claims being originally cognizable in court by the terms of APTRA § 12), provided the doctrine is applicable under the issues raised and the statutory scheme that applies to the case.[3] *See United States v.*

2. Section 12 provides:

   The validity or applicability of any rule ... may be determined in an action for declaratory judgment in a district court of Travis County, and not elsewhere, if it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The agency must be made a party to the action. *A declaratory judgment may be rendered whether the plaintiff has requested the agency to pass on the validity or applicability of the rule in question.* However, no proceeding brought under this section may be used to delay or stay a hearing after notice or hearing has been given if a suspension, revocation, or cancellation of a license by an agency is at issue before the agency. (Emphasis added).

   The provision that one need not first initiate a proceeding in the agency, in order to obtain a declaratory judgment in the cause of action authorized by § 12, indicates quite clearly that the jurisdiction intended to be conferred on the district court in that section is original and not appellate. The same is indicated by the proposition that in such suits the action or decision taken by the agency is not the subject of the suit; the subject is, rather, the validity or applicability of the rule itself.

3. In the course of our opinion, we shall observe the distinction that the "primary jurisdiction" doctrine applies in cases that fall within the *original* jurisdiction of the district court while the "exhaustion of administrative remedies" doctrine applies in cases that fall within the *"appellate"* jurisdiction that some courts are given by statute to review the actions of administrative agencies. We do so for convenience alone. A word of explanation is required in this regard.

   In *United States v. Western P.R. Co.,* 352 U.S. 59, 63–65, 77 S.Ct. 161, 164–166, 1 L.Ed.2d 126 (1956), the Court distinguished between the two doctrines as follows:

*Western Pacific Railroad*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Schwartz, Administrative Law, § 8.23, at 485–86 (1984). We have held above that the doctrine *is* applicable in the present case and the holding and rationale apply equally to Bell's assertion of jurisdiction under APTRA § 12.

■ *Jurisdiction under PURA §§ 69 and 85 and APTRA § 19(a).* Bell argues finally that the district court possessed

subject-matter jurisdiction because it was vested with such jurisdiction by the terms of APTRA § 19(a) and PURA §§ 69 and 85.

We need not consider whether APTRA § 19(a) constitutes a grant of jurisdiction standing alone. We need not do so for the obvious reason that it applies on its face to the judicial review of "contested cases," and the Commission ruling of which Bell complains was not made in a contested-case proceeding conducted under APTRA

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a *claim* is *cognizable in the first instance by an administrative agency alone;* judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a *claim* is *originally cognizable in the courts,* and comes into play whenever enforcement of the claim requires the resolution of issues within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views....
>
> No fixed formula exists for applying the doctrine of primary jurisdiction. *In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.* These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions.... More recently the expert and specialized knowledge of the agencies involved has been particularly stressed.... The two factors are part of the same principle, "now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained

> through experience, and by more flexible procedure." [citation omitted].
>
> (Emphasis added). Professor Davis points out that the "primary jurisdiction" doctrine "is not a doctrine that governs judicial review of administration" but simply "determines whether the court or the agency should make the initial decision." Davis, Administrative Law Treatise § 19.01, at 373 (1972). "[I]t governs only the question whether court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue." *Id.* One should note that he utilizes the word "issue" and not the word "claim." He describes the function of the doctrine as follows:
>
>> The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some *question* or some *aspect* of some question arising in the proceeding before the court. (emphasis added).
>
> *Id.* And, he distinguishes the "exhaustion" doctrine by stating that it "govern[s] the timing of judicial review of administrative action." *Id.* Professor Schwartz apparently disagrees to some extent for he states that the doctrines of primary jurisdiction and "exhaustion" "are two sides of the timing coin...." Schwartz, Administrative Law, § 8.23 at 485 (1984). He seemingly adheres to the distinction of the *Western Pacific Railroad* case quoted above: "exhaustion" applies when the claim is cognizable in the first instance in the agency alone while "primary jurisdiction" applies when the claim is originally cognizable in the courts, but the claim requires the initial resolution of an issue which, under the regulatory scheme, has been placed within the special competence of the agency. *Id.,* at 486.
>
> Without going further into the matter, we will simply discuss the primary-jurisdiction doctrine in connection with Bell's claims of original jurisdiction in the district court under the court's inherent power and under APTRA § 12. Then, we will discuss "exhaustion of administrative remedies" in connection with Bell's claims that the trial court had "appellate" jurisdiction under APTRA § 19 and PURA §§ 69 and 85.

§§ 13–18. The terms of APTRA § 19(a) should, however, be construed with those of PURA § 69 as discussed below.

It is equally plain that PURA § 85 cannot have the effect for which Bell contends. The statute provides:

*During the pendency of an appeal,* the district court ... may stay or suspend ... the operation of the regulatory authority order, ruling, or decision ... in accordance with the practice of courts exercising equity jurisdiction (emphasis added).

The statute thus presumes the existence of jurisdiction and simply provides for an ancillary remedy that might be awarded pending judicial review.

The Legislature provided as follows in PURA § 69:

Any party to a *proceeding* before the commission is entitled to judicial review under the substantial evidence rule. The commission shall be a party defendant in any such proceeding represented by the attorney general. (Emphasis added).

It is indisputable that this is a grant of special statutory jurisdiction to review a "proceeding" conducted by the Commission. It is equally plain that the rulemaking proceeding initiated by Bell was, in ordinary usage, a "proceeding." In PURA § 3(q), moreover, the word "proceeding" is defined to mean "any hearing, investigation, inquiry, or other fact-finding or decision-making procedure under [PURA] and includes the denial of relief or the dismissal of a complaint." This definition is so broad as to permit, facially at least, the judicial review of almost any order the Commission might enter at any point in any kind of transaction before the agency, whether dealing with contested cases, rulemaking, investigations, or enforcement. We have previously expressed doubt that the Legislature intended PURA § 69 to be interpreted so broadly—specifically, that the statute probably was not intended to permit the judicial review of *interim* orders in contested cases, for the result would be an intolerable interference by the judiciary with the Commission's performance of its statutory duties under PURA. *Public*

*Utility Comm'n v. Pedernales Elec. Co-op.*, 678 S.W.2d at 219–20; *see also Sun Oil Company v. Railroad Commission of Texas*, 158 Tex. 292, 311 S.W.2d 235, 236 (1958); *Texas State Board of Examiners in Optometry v. Carp, supra*, 343 S.W.2d at 246; *Payne v. Texas Water Quality Board*, 483 S.W.2d 63, 64 (Tex.Civ.App. 1972, no writ). In all likelihood, the Legislature intended PURA § 69 to be coextensive with APTRA § 19, so that the former should be understood as conferring the power of judicial review with respect to the final orders of the Commission in contested cases. *See,* Fitzwater, *Public Utility Commission: Appellate Procedure and Judicial Review,* 28 Baylor L.Rev. 1001 (1976).

In any case, the jurisdiction conferred upon a district court by the terms of PURA § 69 does not contemplate claims that are originally cognizable in that court. Rather, it contemplates only those that are first determinable in the Commission. Thus, PURA § 69 must be construed in light of the rule that requires a complaining party to exhaust his administrative remedies before he may obtain judicial review of agency rulings. Schwartz, *supra.* This rule existed before the enactment of APTRA § 19(e) and its express requirement in that regard.

In one sense, the Commission's order denying Bell's request is "final" for it terminated that proceeding by denying the request. But the controversy remains, Bell being in the same position as it was before. *See Sun Oil Company v. Railroad Commission of Texas*, 158 Tex. 292, 311 S.W.2d 235 (1958). Under the express terms of the Commission's order, however, it invited Bell to pursue an available administrative remedy by requesting a revision of its tariff, a matter over which the Commission has *undoubted* jurisdiction. As mentioned previously, in our discussion of the doctrine of "primary jurisdiction," Bell does not contend that a tariff-revision proceeding will be inadequate to resolve the pertinent issues or insufficient for its protection, either ultimately or pending the course of a tariff-revision proceeding. It appears to us that

the pertinent issues are intricate and dependent upon a variety of factual circumstances. They necessarily involve the consideration of specialized matters only dimly perceived by a court but well within the specialized knowledge, experience, and understanding of the Commission—a public body that is statutorily charged to determine those matters according to *its* perceptions of the public interest, arrived at under the supervision and policy-making determinations of public officials elected for those very purposes.[4] We refer, for example, to the competition, antidiscrimination, and monopoly considerations mentioned previously as well as the determination of such matters as what magnitude of telephone users and geographical scope will be proper and feasible for Commission jurisdiction over the "switching systems" and how those systems may be distinguished from other forms of operation and equipment. In these circumstances, the doctrine of exhaustion of administrative remedies should apply with full force and effect to preclude judicial review under PURA § 69 *before* the Commission has had the *final* word on the relevant issues. *Railroad Commission v. Wencker*, 140 Tex. 527, 168 S.W.2d 625 (1943); *Sproles Motor Freight Line v. Smith*, 130 S.W.2d 1087 (Tex.Civ. App.1939, writ ref'd); Davis, Administrative Law Treatise, §§ 20.01–.10, at 382–95 (1972); *see generally, Texas State Board of Examiners in Optometry v. Carp*, 162 Tex. 1, 343 S.W.2d 242 (1961); Schwartz, *supra*, §§ 8.30–.31, at 502–07; Marschall, *Timing of Judicial Review*, 33 Tex.L.Rev. 701 (1955). We hold accordingly.

Accordingly, we affirm the judgment of the district court.

CARROLL, JJ., not participating.

---

4. In particular reference to telecommunications utilities, such as Bell, and the unregulated services that Bell contends should be regulated, the Legislature stated as follows in PURA § 18(a):
    ... The legislature finds that the telecommunications industry through technical advancements, federal judicial and administrative actions, and the formulation of new telecommunications enterprises has become and will continue to be in many and growing areas a competitive industry which does not lend itself to traditional public utility regulatory rules, policies, and principles; and that therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest and to provide equal opportunity to all telecommunications utilities in a competitive marketplace. It is the purpose of this section to grant to the commission the authority and the power under this Act to carry out the public policy herein stated.

A court would tread on thin ice indeed if it attempted to resolve initially the issues implicit in this statement, if it could even imagine what those issues are. Obviously, some issues might arise that a court may not determine at all. *See State v. Associated Metals & Minerals Corp.*, 635 S.W.2d 407 (Tex.1982).