**EL PASO ELECTRIC COMPANY, Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

No. 14678.

Court of Appeals of Texas, Austin.

Jan. 21, 1987.

Rehearing Denied April 8, 1987.

Barry Bishop, Clark, Thomas, Winters & Newton, Austin, for appellant.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Alan Holman, Brown, Maroney, Rose, Barber & Dye, Brad Yock, Asst. Public Counsel, Austin, Norman J. Gordon, Diamond, Rash, Leslie & Smith, Nanette G. Williams, Asst. City Atty., El Paso, for appellee.

Before POWERS, BRADY and CARROLL, JJ.

POWERS, Justice.

In a statutory cause of action authorized by § 69 of the Public Utilities Regulatory Act (PURA),[1] El Paso Electric Company (EPEC) sued in a district court of Travis County for judicial review of a rate order promulgated by the Public Utility Commission (the Commission). In its suit, EPEC requested a temporary injunction forbidding enforcement of the order until after final judgment in the judicial proceeding.

---

1. Tex.Rev.Civ.Stat.Ann. art. 1446c (Supp.1986).

The trial court denied the request and EPEC has taken this interlocutory appeal.[2] We will affirm the trial-court order.

## THE CONTROVERSY

On June 24, 1985, EPEC instituted in the Commission a new rate proceeding by filing a statement of the utility's intention to increase the rates it charged for electricity in the unincorporated parts of El Paso, Culberson, and Hudspeth Counties. PURA § 43(a). Shortly thereafter, EPEC instituted another rate proceeding by its appeal to the Commission from ratemaking ordinances enacted by the municipalities of El Paso, Vinton, Clint, and Anthony. PURA §§ 17, 26(a).[3] The Commission consolidated the two proceedings and after hearing issued a single final order dated January 31, 1986, to be effective on the same date. The general effect of the new rate order is to reduce EPEC's annual revenue by approximately 14.3 million dollars. From the Commission's denial of its motion for rehearing, EPEC sued for judicial review and requested that the district court issue a temporary injunction prohibiting *pendente lite* the enforcement of certain matters required by the Commission's order.[4] We now review by interlocutory appeal the correctness of the district-court order denying the temporary injunction.

EPEC contends the order is invalid because it is based upon the following errors committed by the Commission in its findings of fact: (1) an erroneous reduction in the utility's capital, resulting from the elimination of certain investment-tax credits; (2) an erroneous disallowance of certain additions to the utility's depreciation account; and (3) an erroneous reduction in the utility's cost-of-service allowance, in an amount equal to the federal income taxes the utility could have avoided by filing with its subsidiary a consolidated tax return. These factual determinations were, of course, made solely for the purpose of ratemaking under PURA § 37. In EPEC's view, each of the determinations is erroneous under the Internal Revenue Code (IRC), 26 U.S.C.A. § 1 *et seq.* (West 1978 & Supp.1986); and, if the utility implements the order as directed by the Commission, the utility will be in violation of the Code. Consequently, it will forever lose certain tax benefits to which it is entitled under the Code and will be exposed to an increased tax liability that it may not recover from its ratepayers in any future rate proceeding. In the face of these contentions, the district court denied on the following grounds EPEC's application for temporary injunction: (1) any adverse tax consequences will not attach until after the conclusion of judicial review; (2) the Commission possesses authority to provide a mechanism by which EPEC may recover its attendant losses should any of EPEC's contentions be sustained on judicial review; and (3) the Texas Administrative Procedure and Texas Register Act (APTRA)[5] provides an adequate legal remedy for the reparation of any loss that EPEC might

2. The interlocutory appeal is taken pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 51.014(4) (1986). The parties to the appeal are: appellant, El Paso Electric Company; appellees, Public Utility Commission of Texas, City of El Paso, ASARCO, Inc., Border Steel, Phelps Dodge, and the Office of Public Utility Counsel. This Court previously issued a temporary injunction to protect its jurisdiction. Tex.Gov't. Code Ann. § 22.221(a) (1985).

3. Before the enactment of PURA, the power to regulate public utilities in Texas was expressly delegated to city commissions and councils. *See City of Baytown v. General Telephone Company of the Southwest*, 256 S.W.2d 187 (Tex.Civ. App.1953, writ ref'd n.r.e.); Newcomb, *Some Aspects of Regulation of Public Utilities Operating in the State of Texas*, 5 Baylor L.Rev. 335 (1953). The 64th Legislature in passing PURA transformed what was a local form of regulation into statewide regulation and created a new Public Utilities Commission with regulatory responsibility for utilities in Texas. Thus what was once essentially a contractual relationship between utility and municipality became a complex statutory scheme for the determination of utility rates with a full panoply of administrative procedures and protections. *See Public Utilities Commission of Texas v. Pedernales Electric Co-operative*, 678 S.W.2d 214 (Tex.App.1984, writ ref'd n.r.e.)

4. Normally, the filing of a petition for review does not affect the enforcement of an agency decision. APTRA § 19(b)(3).

5. Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (Supp.1986).

sustain pending the conclusion of judicial review. On appeal, EPEC contends the district court abused its discretion in denying on these grounds the utility's application for temporary injunction.

## TEMPORARY INJUNCTIONS UNDER PURA § 85

■ The power to restrain or "stay" the actions of an administrative agency is "part of a court's traditional equipment for the administration of justice." Jaffe, *Judicial Control of Administrative Action*, ch. 18, at 687 (1965). Before the enactment of PURA, Texas courts exercised their inherent equity powers, in proper cases, to restrain enforcement of confiscatory rate ordinances enacted by municipalities. *Glen Oaks Utilities, Inc. v. City of Houston*, 161 Tex. 417, 340 S.W.2d 783, 785 (1960). In cases involving the judicial review of final orders issued by the Commission, the power was made statutory in PURA § 85:

Sec. 85. During the pendency of an appeal, the district court, the court of civil appeals, or the supreme court, as the case may be, may stay or suspend, in whole or in part, the operation of the regulatory authority order, ruling, or decision and such courts in granting or refusing a stay or suspension *shall act in accordance with the practice of courts exercising equity jurisdiction.*

(emphasis added). Hence, courts will continue to use and apply equitable principles in their consideration of an application for temporary injunction under PURA § 85. When the application requests the suspension of a rate order, under authority of PURA § 85, the applicant must show: (1) a reasonable probability that it will succeed on the merits of its claim, after final hearing; (2) that the loss to which the utility is exposed will be irreparable; and (3) that the utility's customers will be protected adequately by bond during the period the rate order is suspended. *Southwestern Bell Telephone Co. v. Public Utility Commission of Texas*, 571 S.W.2d 503, 506 (Tex.1978). "It is also well settled that the sole question to be determined on appeal in the granting or refusing of a temporary injunction, is whether or not the trial court

abused its discretion in rendering the order appealed from." *Id.*

## ABUSE OF DISCRETION

The standard of appellate review thus given us—whether the trial court "abused" its "discretion"—is a familiar one. It applies to limit the scope of reversible error in the appellate review of a myriad of trial-court rulings and determinations, including the grant or denial of temporary injunctions. While it is often treated opaquely, either by itself or by merely substituting equally subjective and amorphous concepts, such as "arbitrary," "capricious," "harsh," or "unreasonable," it is susceptible of rational treatment in light of the complex and subtle aspects of the trial and appellate-court relationship. *See generally, Johnson v. United States*, 398 A.2d 354 (D.C.Ct. App.1979); Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747 (1982); Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635 (1971). Such matters need not detain us in the present appeal, however, because the controlling issue is whether the district court misapplied the law to facts that may be taken as established. The record reveals that the trial court denied the requested temporary injunction based on that court's interpretation of the applicable law given in various statutes and judicial decisions. It is said that "[t]he trial court abuses its discretion when the law is misapplied to established facts...." *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975). In such a case, however, there naturally arises the question of whether the trial court really possessed any "discretion" at all, in the sense of a power to choose between legally *permissible* alternatives. In any event, this statement of the law is sufficient here and we may not hold the district court erred in refusing the temporary injunction unless it misinterpreted the law.

The district court's denial of the temporary injunction rests upon the following conclusions of law filed in the case: (1) the "only significant ... irreparable injury ... relied upon by" EPEC was its exposure to

a greater income-tax liability; (2) this liability would depend not upon the Commission's final order issued dated January 31, 1986, which is the subject of the underlying suit for judicial review, but would depend instead upon the final order issued by the Commission following remand of the case to the agency, assuming the order of January 31, 1986 is reversed after completion of judicial review on the merits in the underlying case; (3) *if* an additional tax liability should be the consequence of any error in the final order of January 31, 1986, "the Commission would necessarily have to provide a mechanism, such as a surcharge, to allow the utility to collect prospectively the amount of such tax loss ...", and, (4) AP-TRA "provides an adequate legal remedy for any loss suffered by [EPEC] as a result of Commission error." We must therefore decide if the district court, in these particulars, correctly interpreted and applied the law to the established facts. We hold that it did.

### IRREPARABLE INJURY AND ADEQUATE LEGAL REMEDY

EPEC does not challenge the district court's conclusion of law that the only significant injury in issue is the utility's contention that it will sustain an increased income-tax liability unless the effective date of the January 31, 1986 order be suspended pending judicial review thereof.

■ In two points of error, EPEC contends the district court erred in its conclusions of law that: the Commission possesses authority to provide a mechanism, such as a surcharge, to permit the company to recover prospectively any loss attributable to the tax consequences of the Commission order dated January 31, 1986; and, APTRA provides a clear, full, and adequate legal remedy by which any such loss may be recovered by the company. These are actually two sides of the same coin.

It is plain that these conclusions of law by the district court represent its application of our holdings in *Southwestern Bell Telephone Company v. Public Utility Commission of Texas,* 615 S.W.2d 947 (Tex.Civ.App.) writ ref'd n.r.e., *per curiam* 622 S.W.2d 82 (Tex.1981). There we held that the remedy of remand, established in APTRA § 19, constituted an adequate legal remedy when a utility subject to PURA is required to implement, during the course of judicial review, utility rates that are established in a final order that is ultimately reversed on appeal. We held as well that the Commission possessed authority, following remand and issuance of a new final order, to provide a mechanism, such as a surcharge, to permit the utility to recover any loss sustained by reason of its implementation of the erroneous rates originally ordered by the Commission. Consequently, a "stay" under PURA § 85 was not justified under equitable principles because the statutory remedy of remand was adequate and the loss sustained in the course of judicial review was not irreparable in consequence. EPEC challenges the applicability of our decision in the *Southwestern Bell* case.

First, EPEC would distinguish our decision on the ground that the *Southwestern Bell* case involved a Commission order that *denied* a rate *increase* requested by the utility, whereas the present order directs a *reduction* in the rates previously charged by EPEC. Our holdings in the *Southwestern Bell* case were more fundamental, however, and were based on our interpretation of statutes that apply equally in either case:

> The Legislature did not intend for remand to be a sterile remedy under [AP-TRA] § 19.
>
> \* \* \* \* \* \*
>
> If [APTRA] § 19 was intended to be an "adequate" legal remedy, it necessarily follows that it was intended to be meaningful in its grant of power to a reviewing court to "remand the case for further proceedings" in the agency. For that power to be effective or real, the agency to which remand is made must have the legal competency or power to conduct any "further proceedings" directed by the court.
>
> Where there exists a statutory right of appeal from an administrative agency's

action, this right is normally an adequate remedy to preclude the issuance of an injunction against enforcement of a rate order.... Thus, if the remedy of remand under [APTRA] § 19 is meaningful and effective, and if the agency must correct whatever errors it committed to the appellant's prejudice, the utility in the present case would have an "adequate legal remedy" and it would not be necessary to suspend the Commission's final order, under PURA § 85, in order to prevent irreparable loss.

*Id.* at 954, 955. We therefore reject the distinction urged by EPEC.

EPEC next contends that our holdings in *Southwestern Bell* were not controlling because the Supreme Court of Texas, in noting "no reversible error" when it refused writ of error in the case, also stated: "We expressly reserve the question of the Commission's ability [sic] to retroactively adjust rates under the Public Utility Regulatory Act...." 622 S.W.2d at 83. Texas Rule of Appellate Procedure 133(a) (West 1986) provides in part:

In all cases where the Supreme Court is not satisfied that the opinion of the court of appeals in all respects has correctly declared the law, but is of the opinion that the application presents no error which requires reversal, the Court will deny the application with the notation "Refused. No Reversible Error."

Thus, the Supreme Court neither approved nor disapproved our holdings in the *Southwestern Bell* case; its reservation only points to the part of our opinion which remained open to question in the Supreme Court's view.[6] We remain convinced of the correctness of our holdings and the reasoning upon which they are based. We hold in consequence that the district court did not err in the particulars complained of by EPEC.

## INTERPRETATION OF THE INTERNAL REVENUE CODE

Assuming for purposes of discussion that the trial court erred in applying our holdings in the *Southwestern Bell* case, for any reason, the court's refusal of the temporary injunction must be sustained on another independent ground. Under the applicable provisions of the Internal Revenue Code, no injury was imminent because any adverse tax consequences would not attach until after the conclusion of judicial review of the Commission's final order dated January 31, 1986. EPEC contends the district court erroneously construed these statutory provisions in reaching this conclusion of law. We disagree.

EPEC's contention centers upon those provisions in the Internal Revenue Code that disallow investment tax credits where they have been used to reduce a utility's cost of service or its rate base:

General rule.—Except as otherwise provided in this subsection, no credit determined under subsection (a) shall be allowed by section 38 with respect to any property described in section 50 ... which is public utility property ... of the taxpayer—

(A) Cost of service reduction.—If the taxpayer's cost of service for ratemaking purposes is reduced by reason of any portion of the credit determined under subsection (a) and allowable by section 38 ...; or

(B) Rate base deduction.—If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit determined under subsection (a) and allowable by section 38....

IRC § 46(f)(1). The Commission directed certain reductions in EPEC's capital in arriving at the rates established in the agency's final order. EPEC contends that implementation of these rates, based on the

---

**6.** In passing, we note that one commentator has said of such a practice that "the mere pointing out of an unapproved portion would be worse than meaningless without a statement of the reasons for the Supreme Court's disapproval." Simpson and Wall, *Problems of Precedent Affecting Court of Appeals Opinions,* 4 Sw.L.J. 398, 404 (1950). "Reserving" the question only causes the parties to argue the effect of that reservation and to waste time speculating about what the Supreme Court might hold were it forced to write an opinion on the issue. The effect of the notation on the writ is unchanged by such a practice.

reduced capital amount, will necessarily cause the company to be in violation of IRC § 46(f).[7] If that contention is correct, EPEC will be required to file amended tax returns and refund to the Internal Revenue Service approximately $63 million, owing to the investment-tax credits it has taken since 1972. In addition, EPEC will not receive the benefit of approximately $43 million in such credits that it presently carries on its books of account.

The correctness of EPEC's argument depends upon *when* such adverse tax consequences must occur. This depends, in turn, upon the correct interpretation of another provision in the Internal Revenue Code. Section 46(f)(4) provides that paragraph (1), quoted above, shall not apply to disallow previously claimed investment-tax credits, with respect to a public utility's property, "before the first final determination which is inconsistent with paragraph (1)...." EPEC contends the "determination" referred to is the Commission's final order of January 31, 1986, so that the utility's loss of investment-tax credits will occur on the effective date of that order.[8] The district court concluded that the "determination" referred to is rather the judgment of the court that finally affirms the order of January 31, 1986 following the judicial-review

proceedings invoked by EPEC, if the order is indeed affirmed.

We may look to other provisions of the Internal Revenue Code to determine the correct meaning to be assigned § 46(f)(4). The word "determination" is defined in the Code to mean "a determination made with respect to public utility property ... by a governmental unit, agency, instrumentality, or commission or similar body ... which determines the effect of the credit...." IRC § 46(f)(4)(B). A determination is "final" under the Code "if all rights to appeal or to request a review, a rehearing, or a redetermination, have been exhausted or have lapsed...." IRC § 46(f)(4)(C)(i). The judicial review authorized by PURA § 69 is an integral part of the administrative process conducted by the Commission under that statute, as indicated by the reviewing court's power of reversal and remand with respect to the Commission's final orders, as delineated in APTRA § 19, when PURA has not been administered correctly in a particular case. It is unreasonable to suppose that Congress intended that a "determination" by an administrative agency should be "final" when it might nevertheless be reversed and changed by the very body that made the determination initially, owing to errors made in the process by which the determination was made.[9] We

---

7. Appellees contend the adjustments in EPEC's capital structure will not cause EPEC to be in violation of IRC § 46(f). EPEC's contention, they argue, rests on a mischaracterization of the adjustment as a reduction for investment tax credits. The adjustments in actuality derive from three components, all relating to Franklin Land & Resources (FL & R), a wholly-owned subsidiary of EPEC. The adjustments are summarized as follows:

| | |
|---|---|
| Undistributed earnings of FL&R | $ 8,875,552 |
| FL&R ITC Tax Leases | 6,889,446 |
| Amounts Paid to FL&R in Excess of Tax Saving Realized | 18,200,338 |
| Total Common Equity Deduction | $33,965,336 |

Appellees contend that disallowance under § 46(f) only applies to reductions relating to utility property. FL & R's business is not utility related and, therefore, EPEC would not be subject to any disallowance.

While this argument appears to merit consideration, we leave its resolution for another day. Our concern here is only whether the trial court abused its discretion in denying EPEC's application for temporary injunction. In view of our

holding that EPEC will not suffer irreparable injury, we need not address the merits of the case.

8. Treasury regulation 1.46–6(f)(6) provides:

*Notification & other requirements.* The taxpayer shall notify the district director of a disallowance of a credit under paragraph (f)(3) of this section within 30 days of the date that the applicable determination is put into effect. In the case of a disallowance, the taxpayer shall recompute its tax liability for any affected taxable year, and such recomputation shall be made in the form of an amended return when necessary.

The "applicable determination" is of course the "first final determination" referred to in IRC § 46(f).

9. The parties have cited no cases, and we find none, construing the meaning of "first final determination." We feel the statutory language and legislative history are fairly clear that final determination was meant to encompass judicial review as well as exhaustion of administrative remedies.

hold therefore that the district court correctly interpreted the relevant parts of the Internal Revenue Code in reaching its conclusion of law that no adverse tax consequences would attach by reason of the agency order of January 31, 1986, until that order is finally affirmed by a reviewing court or the right to judicial review of that order has lapsed.

We accordingly affirm the order of the district court refusing the temporary injunction requested by EPEC. Our previous injunction is continued in effect so long as the appeal remains within the jurisdiction of this Court.

The word "final" may imply different meanings in different contexts. *McWilliams v. McWilliams,* 531 S.W.2d 392 (Tex.Civ.App.1975, no writ); *see generally* 4 McDonald, Texas Civil Practice § 17.03 (1983). For the purpose of taking an appeal to a reviewing tribunal, one may say a judgment is "final" when it disposes of all the parties and issues in the cause. On the other hand, for the purpose of applying the doctrine of res judicata, a judgment becomes "final" when it is "procedurally definite," a term encompassing several elements pertaining to the state of the proceedings. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381 (Tex. 1985); *But cf., Scurlock Oil Company v. Smithwick,* 724 S.W.2d 1 (Tex.1986).

EPEC's argument is founded on the assumption that the expression "final determination," as used in the Code, represents a Congressional intention that the proceeding should be "final" in the sense of its being eligible for judicial review. This is the sense of the word used in APTRA § 19(b) where it is provided that judicial-review proceedings are instituted by the filing of "a petition within 30 days after the decision complained of is *final* and appealable." (emphasis added). We find, however, that Congress expressly contemplated the possibility of judicial review and intended that the agency's determination should not be "final" until there no longer existed the possibility that it might be reversed on judicial review:

. . . If the first order as to a company after the bill's enactment is inconsistent with the limitations of the applicable option, it would not result in disallowance until the order had been affirmed through the appellate process or the company had let its right to appeal expire, and the order had been put into effect. . . .

S.Comm.Rep.Pub.L. 92–178 92d Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. and Admin. News 1825, 1947 92d Cong., 1st Sess. Further, § 46(f)(4)(A), quoted above, provides that investment tax credits will not be disallowed until the final determination is "put into effect." Treasury regulation 1.46–6(f)(9) provides:

*Put into effect:* A determination is put into effect on the later of—

(i) The date it is issued (or, if a first final inconsistent determination, the date it becomes final) or

(ii) The date it becomes operative.

Contrary to EPEC's argument, this section appears to provide for the very situation involved in this case. The PUC's order became *operative* when it became a *final, appealable* order for the purposes of APTRA § 19 after all administrative remedies had been exhausted. However, the regulation provides that the determination in a case such as this will *not* be put into effect until a final inconsistent determination is made, indicating that the credits will not be disallowed until all appeals have been exhausted.