TEXACO, INC., et al., Appellants,

v.

RAILROAD COMMISSION of Texas
et al., Appellees.

No. B–7909.

Supreme Court of Texas.

May 9, 1979.

Stubbeman, McRae, Sealy, Laughlin & Browder, Joe R. Greenhill, Jr. and Milton Bankston, Austin, Vinson & Elkins, Raybourne Thompson, Houston, for appellants.

Mark White, Atty. Gen., Ralph T. Aldave, Asst. Atty. Gen., Austin, McGinnis, Lochridge & Kilgore, Robert C. McGinnis and S. Jack Balagia, Jr., Austin, for appellees.

CAMPBELL, Justice.

This is a direct appeal from a district court judgment. Texaco Inc. and Vernon W. Frost et al. applied to the Railroad Commission for a permanent suspension of a bonus allowable rule (Rule 20), in the Fig Ridge (Seabreeze) Oil Field in Chambers County. The Commission denied the suspension, and the decision was upheld by the District Court of Travis County.

The Fig Ridge Oil Field was discovered in 1941 in the Frio Formation in Chambers County, Texas. The producing sand is composed of six distinct members, of which the uppermost Seabreeze A–1 sand is the principal producing member. Originally, the oil in the field was accumulated along an underground anticline, or salt dome, and was bounded on the East and South by sealing faults and by oil-water contact on the West and North. The field dips gradually from East (up-structure) to the West (down-structure). The principal producers are Frost and Texaco, with production in the center of the field, and Sun Oil Company, with production on the east and west sides. Thus, Sun's properties are at the bottom and top of the anticline while Texaco's and Frost's properties are at the middle.

Shortly after the completion of the field in 1945, the operators determined that the natural water drive in the field was insufficient to maintain the necessary pressure in the reservoir to produce all the recoverable oil and by 1954 the Sun leases on the west side of the field had already watered out. Texaco, Frost and Sun determined that if maximum recovery was to be realized, additional water had to be injected along the low side of the anticline to supplement the natural water drive and to maintain reservoir pressure.

In 1954, the three operators entered into a cooperative water injection pressure maintenance program agreement and presented their proposed agreement to the Railroad Commission for its consideration. In seeking Commission approval to conduct the pressure maintenance program all three parties proposed the adoption of special field rules for the Fig Ridge (Seabreeze) field. Included in the proposal was Rule 20, providing for a "bonus allowable." This rule allows an increase in the number of barrels of oil the parties are allowed to produce in proportion to the number of barrels of water injected into the field. On July 31, 1954, the operators executed a construction and operation agreement, the stated purposes of which were: (1) to arrest and equalize the declining pressures throughout the field and to not only increase the current rate of recovery of oil but also to increase the ultimate recovery and (2) to protect the correlative rights of all affected parties.

This program, including Rule 20 giving the operators a bonus allowable for water injection, was implemented by Commission order dated April 27, 1954. The program continued without incident from 1954 through 1973. Throughout the almost twenty-year period all three parties were benefiting substantially from the pressure program because the water injection slowed the decline in reservoir pressure and all parties were able to produce more oil through the bonus allowable.

At the beginning of the water injection program, pressures throughout the field were fairly uniform, with a slight gradient from east to west. Now the pressure differential across the field is more than 400 psig. The injection wells along the western and northern rim of the field created an area of high pressure and caused oil to be

pushed up the anticline toward the east. The result has been a migration of oil away from the leases owned by Texaco and Frost toward the Sun leases on the eastern side of the field. By late 1973, the Texaco and Frost wells had begun to produce less oil and more water, and Sun was the only operator in the field that was able to produce all of the bonus allowed to each operator.

Texaco and Frost contend that the pressure differential in the field is being enhanced by Sun's ability to produce the full bonus allowable and that by the end of 1979, Sun will be the only operator in the field with the capacity to produce any bonus allowable. On February 23, 1977 Texaco and Frost applied to the Commission for permanent suspension of the bonus allowable rule. The Commission, after a hearing before an examiner, adopted the following findings of fact:

(a) The injection program initiated by the parties in 1954 has resulted in the watering-out of wells on the down-dip leases and the migration of oil to the up-dip leases. (Findings number 1, 2, 3, 7 and 8.)

(b) The ultimate recovery of oil will be increased by 12,000,000 barrels without the bonus. (Finding number 4); and

(c) An additional 800,000 barrels will be produced as a result of the bonus and the injection. (Finding number 5); and

(d) One-half of the 800,000 barrels presently underlies Sun Oil Company's leases in the lower formations other than the main Seabreeze A–1 sand. (Finding number 6.)

The Commission concluded that the continuation of the bonus allowable rule is a waste prevention measure properly in the Commission's jurisdiction and issued an order denying the permanent suspension.

Texaco and Frost contend the Commission's order is invalid because:

(1) The order violates the correlative rights of appellants by allowing production of bonus allowable under the Rule 20 even though bonus production is causing and will cause net uncompensated drainage of oil from their properties.

(2) The conclusion of law that the bonus allowable is a waste prevention measure is based on fact finding number 5

(a) which is not supported by substantial evidence,

(b) even if it were such finding is not sufficient to support the conclusion that 800,000 barrels of oil will ultimately be lost if the bonus allowable is discontinued; and

(c) there is no substantial evidence to support a finding that the continuation of bonus allowable is necessary to prevent waste.

(3) The order adopts a waste prevention measure which causes confiscation in lieu of a waste prevention measure which will avoid confiscation.

■ The Commission's order is presumed to be valid. The question is not whether the Commission came to a proper factual conclusion on the basis of conflicting evidence, but whether it acted arbitrarily and without regard to the facts. Our duty is to look to the record as a whole to see whether the order of the Commission is reasonably supported by substantial evidence and to determine whether there is in the record competent evidence which reasonably supports the order. If so, the Commission's order will be sustained. *Pickens v. Railroad Commission*, 387 S.W.2d 35 (Tex.1965).

It is undisputed that the migration of oil to Sun leases will continue as a result of the water injection pressure maintenance program and that the Texaco and Frost properties will be drained more with the bonus allowable than without it. The migration of oil represents "net uncompensated drainage" because the oil migrating from their properties is not being replenished. Texaco and Frost contend that this net uncompensated drainage is in violation of their correlative rights.

310

It is now well settled that the Railroad Commission is vested with the power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as *for the protection of correlative rights. Railroad Commission v. Shell Oil Company*, 380 S.W.2d 556 (Tex.1965). While Texaco and Frost are correct that it is an elementary rule of property that a landowner is entitled to an opportunity to produce his fair share of oil from a common reservoir, this rule is qualified by both the rule of capture and the Commission's authority to prevent waste. In *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961 (1945), it was held that the rule in this state recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. It is also held that such rule should be considered in connection with the law of capture, which is recognized as a property right, and both rules are subject to regulation under the police power of this state. Thus, the right to be protected against confiscation under the Commission's oil and gas rules is not unconditional or unlimited.

The business of producing, storing and transporting oil and gas is a business affected with a public interest and subject to regulation by the state. *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73 (1939). Between protecting correlative rights and protecting the public interest of preserving our state's natural resources, the prevention of waste has been held to be the dominant purpose. The Commission, by controlling the oil stored in a common reservoir, is enabled to carry out the dominant purpose of preventing waste. *Brown v. Humble Oil and Refining Co.*, 126 Tex. 296, 83 S.W.2d 935 (1935).

Based on a finding of fact that bonus allowable production would lead to the ultimate recovery of an additional 800,000 barrels of oil, the Commission concluded that this is a waste prevention measure properly within its jurisdiction. Even though the evidence before the Commission was conflicting, there was substantial evidence which reasonably supports the order.

It is undisputed that water injection is necessary to increase production in the field and that the bonus allowable had been proposed by the three operators and had been in effect for more than twenty years. A reservoir simulation study indicated that the bonus allowable would increase ultimate recovery from the field by 800,000 barrels. Engineering reasons given to explain why the bonus allowable will increase recovery and thereby prevent waste were that more rapid production will:

(1) improve drainage in the lower stringers by removing the oil before the encroaching water reaches the wells completed in these stringers;

(2) improve the sweep around individual wells by causing higher pressure draw-down at the well bore;

(3) improve the sweep of oil trapped against the major fault of the field by pulling the oil down to existing wells;

(4) improve the sweep of oil trapped against small faults in the field by pulling oil down to existing wells.

Additionally, the evidence showed that one-half of the 800,000 barrels is located in the lower sand members of the reservoir and that recovery of oil from these layers will be reduced without the bonus allowable because the lower members are at a lower pressure than the A-1 sand members and water is encroaching into the lower members. The bonus allowable will enable the producers to remove more oil before water encroachment reaches the level at which production is no longer economical. There is no evidence in the record to show that this oil could be recovered by any alternate method.

Appellants point out to us previous holdings of this Court which provide that if a property owner has demonstrated that, due to the effect of a Commission order, net uncompensated drainage of oil from his tracts to adjoining tracts is occurring, he has shown he is not receiving a fair chance to produce that oil, or has shown that his property is being confiscated and, the courts have struck down such orders as

invalid, arbitrary, discriminatory and a denial of equal protection of the laws. *Atlantic Refining Co. v. Railroad Commission*, 162 Tex. 274, 346 S.W.2d 801 (1961); *Halbouty v. Railroad Commission*, 163 Tex. 417, 357 S.W.2d 364 (1962); *Marrs v. Railroad Commission*, 142 Tex. 293, 177 S.W.2d 941 (1944). We do not find these cases to be controlling.

The issue in the above cases was whether the allocation formulas were reasonable conservation measures, in light of the fact that they resulted in confiscation. In the *Atlantic Refining Co.* case (Normana) a Commission order allowing a well on a 3/10th acre tract to produce at a rate of 200% more than a well on a 320 acre tract was allowed to produce was not supported by substantial evidence in the record justifying such a wide discrepancy in the rate of production. Waste prevention was not involved and the court held each producer was not allowed to produce his fair share. In the *Halbouty* case (Port Acres) a Commission order which allowed a well on a one-acre tract to obtain 92.87% of its gas recovery and 90.63% of its condensate recovery by drainage from adjoining tracts was held invalid as being arbitrary, unreasonable and confiscatory of large owner's property rights and again waste prevention was not involved. In the *Marrs* case an order which allowed 5,082 barrels per day to be produced from a lease that had only 15% of the recoverable oil in the common reservoir as opposed to 6,500 barrels per day from the lease which had 80% of the recoverable oil was held to be arbitrary, unjust and discriminatory and to deprive the property owners of their just property rights. In fact, the evidence showed this was not necessary to prevent waste. These cases support the proposition that this Court will strike down a Commission order that is not supported by substantial evidence or is arbitrary, unreasonable or confiscatory and thus does not adequately protect correlative rights. Waste prevention orders were not involved.

We do not find any evidence in the record to support a finding that all 800,000 barrels of oil, which the Commission found would be lost without the bonus allowable, can be recovered by any alternate method. Sun's engineering witness testified that approximately one-half of the 800,000 barrels of oil is trapped against the major fault on the southeast side of the field and thus could be recovered by drilling additional wells on Sun's leases. However, there is no evidence that any alternate method exists to recover the remaining 400,000 barrels of oil found to be located in the lower sand members of the reservoir. Sun's engineering witness testified that these 400,000 barrels will be lost unless the oil is produced at the bonus allowable rate before the encroaching water destroys the wells.

■ The existence of an alternate method does not necessarily render the one chosen by the Commission invalid. The Commission is vested with a statutory duty to conserve and prevent the waste of oil and has determined that the bonus allowable provides the best means to accomplish this duty. This Court fully stated this principle in *Railroad Commission v. Mackhank Petroleum Co.*, 144 Tex. 393, 190 S.W.2d 802 (1945). In that case the Commission, in order to prevent waste, had exempted several oil wells from a field-wide shutdown order. This order was based on evidence that the exempted wells would cease to flow if they were forced to shut down seven days a month. The order resulted in drainage from adjacent producers. The Court of Civil Appeals held the order invalid on the ground that the confiscation problem could be solved by closing in the two exempt wells and transferring their allowable to a third and last well. This Court held: "The court cannot strike an administrative order on the ground that the evidence heard by the court indicated that a more equitable one could be entered. That procedure would be destructive of uniformity of administration."

We hold that finding number 5 is sufficient to support the conclusion that 800,000 barrels of oil will ultimately be lost if the bonus allowable is discontinued. We further hold that the order of the Railroad

Commission is reasonably supported by substantial evidence. The Travis County District Court was correct in upholding the order and we affirm the judgment of that court.