RRC V. ARCO 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-91-504-CV





RAILROAD COMMISSION OF TEXAS,



 APPELLANT


vs.





ARCO OIL AND GAS COMPANY, A DIVISION OF ATLANTIC RICHFIELD


COMPANY, MOBIL PRODUCING TEXAS & NEW MEXICO, INC., AND OXY USA INC.,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT



NO. 91-3140, HONORABLE JAMES R. MEYERS, JUDGE PRESIDING



 





 Pursuant to section 12 of the Administrative Procedure and Texas Register Act
("APTRA"), Tex. Rev. Civ. Stat. Ann. art. 6252-13a (West Supp. 1993), ARCO Oil and Gas
Company, A Division of Atlantic Richfield Company; Mobil Producing Texas & New Mexico,
Inc.; and OXY USA Inc. (collectively, "the oil companies"), appellees, filed suit in the district
court of Travis County challenging the validity of Statewide Rule 90(b)(2) promulgated by the
Railroad Commission of Texas ("the Commission"), appellant. The trial court overruled the
Commission's plea to the jurisdiction. Following a bench trial, the trial court declared the rule
invalid and enjoined its enforcement. On appeal, the Commission asserts that the trial court
lacked jurisdiction, committed procedural errors, and erred in holding the rule invalid. We will
reverse the trial court's judgment, declare the rule valid, and render judgment that the oil
companies take nothing by their suit.



FACTUAL AND PROCEDURAL BACKGROUND


 The oil companies are operators in the East Texas Field, a large "water-driven" oil
reservoir. As oil is removed from the reservoir, it is replaced by water moving upward from the
structurally lower portion of the field. The Commission has adopted special field rules for the
East Texas Field, two of which set the maximum allowable rate of oil production from wells in
the field. "Field Rule 23" sets a rate of approximately twenty barrels of oil per well per day. The
"Earned Salt Water Allowance Rule" ("ESWA Rule") grants a bonus oil allowable in certain
circumstances. The structurally highest wells in a water-driven field have a natural advantage
over structurally lower wells, because the higher wells produce for a longer period of time before
water reaches them. In the East Texas Field, the structurally higher portion of the reservoir is
the east side of the field.

 For more than half a century, the Commission conducted monthly "Statewide
Hearings," (1) one purpose of which was to produce "General Market Demand Orders." These
monthly orders were another mechanism used to restrict the amount of oil that wells could
produce, in order to prevent the production of oil from exceeding the lawful market demand. 
Later, the Commission used a monthly "Market Demand Factor" to accomplish this regulation of
production. The Market Demand Factor was a percentage that was applied to each well's
allowable, as determined by statutory law and the Commission's rules, to regulate how much each
well would be allowed to produce for the upcoming month.

 Before 1972 all oil fields in the State were set at a factor below 86%. From 1972
until November 1990, the Commission set the Market Demand Factor for the East Texas Field
and the Kelly-Snyder Field (2) at 86%, while the factor for the rest of the fields in the State was set
at 100%. In the fall of 1990, OXY and Mobil challenged the Commission's Market Demand
Orders for October and November 1990. The district court in that case rendered a final judgment
determining that the Commission's procedure at the Statewide Hearings, in combination with the
adoption of monthly Market Demand Orders, did not comply with the procedural requirements
of APTRA for either contested cases or rulemaking. The court enjoined the Commission from
using its monthly Statewide-Hearing procedure to impose restrictions on oil production.

 By order dated April 1, 1991, after endeavoring to comply with APTRA's
rulemaking requirements, the Commission adopted rule 90, which provides in pertinent part:



(b) The lawful allowable for all oil wells shall be the schedule allowable
multiplied by a factor of 100% except as otherwise provided in this section.


 (1) The schedule allowable for all oil wells in the Kelly-Snyder Field shall
be multiplied by a factor of 86%.


 (2) The schedule allowable for all oil wells in the East Texas Field shall
be multiplied by a factor of 86%.



16 Tex. Admin. Code § 3.90(b) (1993).

 In its brief to this Court, the Commission characterizes rule 90 as the "successor"
to the monthly General Market Demand Orders. The oil companies take exception to this
characterization, arguing that the Commission used the monthly General Market Demand Orders
to restrict production in order to prevent "surface waste" that could result from production of oil
in excess of the market demand, while no attempt has been made to justify rule 90 on the basis
of inadequate market demand.

 The oil companies brought this suit pursuant to section 12 of APTRA, which
permits a party whose legal rights or privileges are impaired or threatened by an agency rule to
challenge the "validity or applicability" of the rule. Although the oil companies challenged the
validity of rule 90(b)(2) on numerous grounds, the trial court's eight conclusions of law were
more narrow, as evidenced by the following three pivotal conclusions:



2. There is no substantial evidence to support the Commission's stated purpose
in Statewide Rule 90 to prevent waste and to protect correlative rights in the
East Texas Field, therefore, Rule 90(b)(2) violates (1) the Equal Protection
Clause of the United States Constitution, (2) the Equal Rights Clause of the
Texas Constitution, (3) the prohibition against the taking of property without
just compensation in the United States Constitution and; (4) the prohibition
against the taking of property without adequate compensation in the Texas
Constitution.


 . . . .


4. Railroad Commission Rule 90(b)(2) was not adopted in substantial compliance
with the Administrative Procedure and Texas Register Act because it lacks a
reasoned justification.


 . . . .


6. Statewide Rule 90(b)(2) violates Section 85.042 of the Natural Resources Code
because it is inconsistent with the top rate of production set by East Texas
Field Rule 23 and the Earned Salt Water Allowable Rule of the East Texas
Field Rules.



On the basis of its conclusions of law, the trial court declared rule 90(b)(2) invalid and enjoined
the Commission from enforcing it. (3)

 Section 12 of APTRA does not provide any standard by which to determine the
validity of an agency rule. This Court has held, however, that an agency rule is invalid if (1) the
agency had no statutory authority to promulgate it; (2) it was not promulgated pursuant to proper
procedure; or (3) it is unconstitutional. See Helle v. Hightower, 735 S.W.2d 650, 654 (Tex.
App.Austin 1987, writ denied); see also Bob E. Shannon & James B. Ewbank II, The Texas
Administrative Procedure and Texas Register Act Since 1976Selected Problems, 33 Baylor L.
Rev. 393, 426-27 (1981). It is obvious from the trial court's conclusions of law that the court
found all three of the foregoing grounds to apply to rule 90(b)(2): conclusion of law two
determines rule 90 to be unconstitutional as a result of insufficient evidence to support the rule's
factual basis; conclusion of law four determines that the procedure mandated by section 5 of
APTRA was not followed because the order adopting the rule does not adequately state a reasoned
justification of the rule; and conclusion of law six determines that the Commission lacked
authority to promulgate rule 90(b)(2) because the rule is inconsistent with existing statutory law.

 In six points of error, the Commission attacks the trial court's judgment. In
addition to challenging the three principal conclusions of law quoted above, the Commission also
raises two threshold questions, one regarding the trial court's jurisdiction and the other regarding
the procedure and standard of review used by the trial court. We will address these threshold
issues first.



TRIAL COURT'S JURISDICTION


 In its first point of error, the Commission asserts that the doctrine of "primary
jurisdiction" deprived the district court of jurisdiction over the oil companies' suit. This doctrine
has been explained as follows:



[C]ourts cannot or will not determine a controversy involving a question which is
within the jurisdiction of an administrative tribunal prior to the decision of that
question by the administrative tribunal, where the question demands the exercise
of sound administrative discretion requiring the special knowledge, experience and
services of the administrative tribunal to determine technical and intricate matters
of fact . . . .



Kavanaugh v. Underwriters Life Ins. Co., 231 S.W.2d 753, 755 (Tex. Civ. App.Waco 1950,
writ ref'd) (emphasis added). In other words, "[p]rimary jurisdiction is the principle which
determines whether the court or the agency should make the initial decision." D & S Invs., Inc.
v. Mouer, 521 S.W.2d 118, 120 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.) (emphasis
added).

 The oil companies brought their declaratory-judgment action to challenge rule
90(b)(2) pursuant to section 12 of APTRA. Section 12 provides in pertinent part:



The validity or applicability of any rule . . . may be determined in an action for
declaratory judgment in a district court of Travis County, and not elsewhere, if it
is alleged that the rule, or its threatened application, interferes with or impairs, or
threatens to interfere with or impair, the legal rights or privileges of the plaintiff.
. . . A declaratory judgment may be rendered whether the plaintiff has requested
the agency to pass on the validity or applicability of the rule in question.



APTRA § 12.

 The Commission argues that the primary-jurisdiction doctrine precludes the oil
companies' section-12 challenge. The Commission contends that it has statutory authority to set
production factors in oil and gas fields and that determining the particular factor requires the
special skills and expertise of the Commission. Further, the Commission argues that it retains
primary jurisdiction over assignment of production factors despite the general application of rule
90(b)(2), because subsection (d) of rule 90 specifically provides for an administrative exception
hearing: "The commission, in order to prevent waste or the confiscation of property, may grant
exceptions to this section by assigning a different production factor." See 16 Tex. Admin. Code
§ 3.90(d) (1993). We disagree.

 The primary-jurisdiction doctrine does not apply in the present case, because the
Commission did make the initial decision by promulgating rule 90(b)(2) and designating the 86%
production factor for the East Texas Field. The primary-jurisdiction doctrine merely prevents a
court from ruling on a question before that question has been decided by the administrative
agency. Because the Commission has already decided the production-factor question, the primary-jurisdiction doctrine does not bar the district court's jurisdiction. Accordingly, without addressing
the issue of whether the primary-jurisdiction doctrine can ever apply in a proper section-12 case,
we hold that it does not apply in the present case.

 The Commission's claim that it retains primary jurisdiction through providing rule
90(d) "exception hearings" is without merit. In essence, the Commission contends that, because
it has provided a means to dispute the established 86% production factor, the oil companies must
exhaust that administrative remedy before applying to the courts for relief. However, the oil
companies are not required to exhaust their administrative remedies before initiating a declaratory-judgment action under section 12. See Texas Dept. of Human Servs. v. ARA Living Ctrs. of Tex.,
Inc., 833 S.W.2d 689, 692-93 (Tex. App.Austin 1992, writ denied).

 Moreover, exceptions to the exhaustion-of-remedies requirement exist where such
requirement would cause irreparable injury or where administrative remedies are inadequate. See
Public Util. Comm'n v. Pedernales Elec. Coop., Inc., 678 S.W.2d 214, 220 (Tex. App.-- Austin
1984, writ ref'd n.r.e.); Texas State Bd. of Pharmacy v. Walgreen Tex. Co., 520 S.W.2d 845,
848 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.). Requiring the oil companies to first apply
for an exception hearing could cause them irreparable injury. Rule 90(b)(2) is immediately
effective. Although subsection (d) provides for exception hearings, no provision is made for
staying application of the 86% production factor pending the outcome of the exception hearing. 
If, as the oil companies claim, rule 90(b)(2) is invalid, they will sustain immediate injury during
the pendency of the exception hearing. We will not force the oil companies to be subjected to
potential irreparable injury while the Commission completes its exception hearings. As the Texas
Supreme Court has explained, "An administrative body cannot, by reserving for itself the power
to change the ruling, deprive the courts of jurisdiction to the detriment of the parties injured by
the ruling." Glen Oaks Util., Inc. v. City of Houston, 340 S.W.2d 783, 785 (Tex. 1960); see
also City of Weslaco v. General Tel. Co., 359 S.W.2d 260, 262 (Tex. Civ. App.--San Antonio
1961, writ ref'd n.r.e.). Because rule 90(b)(2) went into effect immediately upon its enactment,
the oil companies had the immediate right to turn to the courts for relief. Glen Oaks, 340 S.W.2d
at 785. Further, the statutory language of section 12 clearly indicates that a plaintiff may bring
a declaratory-judgment action challenging the validity of an agency rule without first requesting
agency review if it is alleged that such rule interferes with or impairs or threatens to interfere with
or impair the legal rights or privileges of the plaintiff. See ARA Living Ctrs., 833 S.W.2d at 692-693.

 In addition, the Commission's administrative remedies are inadequate to provide
the oil companies with the relief requested. The oil companies contend that rule 90(b)(2),
generally applied, is an invalid rule; they do not contend it is invalid only as applied to them. A
rule 90(d)-exception hearing can only determine the validity of the rule as it applies to the oil
companies' wells located in the East Texas Field. We will not require the oil companies to first
be subjected to rule 90(b)(2) before they may challenge its validity. The purpose of a section-12
challenge is "to obtain a final declaration of a rule's validity before the rule is applied." 
Rutherford Oil Corp. v. General Land Office, 776 S.W.2d 232, 235 (Tex. App.--Austin 1989, no
writ). Because the relief available under the remedy provided by the Commission is inadequate,
we will not require the oil companies to pursue this remedy prior to bringing a declaratory-judgment action.

 We reject the Commission's primary-jurisdiction and exhaustion-of-remedies
challenges to the trial court's jurisdiction. We hold that the district court had jurisdiction to reach
the merits of the oil companies' challenge to rule 90(b)(2), and we overrule the Commission's first
point of error.



TRIAL COURT PROCEDURE & STANDARD OF REVIEW


 In point of error six, the Commission asserts that the trial court erred in receiving
evidence outside of the agency order adopting the rule, instead of determining the validity of rule
90(b)(2) from the four corners of the order; the Commission also argues that the trial court erred
in applying a "substantial evidence" standard in its determination of the validity of the rule.

 Regarding the reception of evidence outside the order adopting rule 90(b)(2), the
determination of whether the requirements of section 5(c-1) of APTRA have been satisfied is to
be made from the face of the order adopting the rule. Methodist Hosps. v. Texas Indus. Accident
Bd., 798 S.W.2d 651, 659 (Tex. App.Austin 1990, writ dism'd w.o.j.). We agree with
Professor Beal that the new "reasoned justification" requirement imposed by section 5(c-1) limits
the source or proof available for such a statutory challenge:



By merely requiring a reasoned justification and not defining the term, the
Legislature implied that the same standard of review should be employed by the
courts that it had used in the past. The source of proof is to be limited to the final
notice prepared by the agency. The court should not employ any presumptions nor
should it receive evidence anew. . . . The Legislature now clearly implies that the
court should . . . determine the rationality of the decision based solely on what was
known and relied upon by the agency. Thus, the standard of review by the
judiciary has not changed in determining the validity of a rule; that review is
merely restricted to the four corners of the agency's final notice.



Ron L. Beal, The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of
Legislating and Rulemaking in Texas, 39 Baylor L. Rev. 597, 690 (1987) (footnotes omitted)
(hereinafter referred to as "Beal (I)").

 In the present case, however, the fact that additional evidence is not to be
considered in applying the reasoned-justification standard does not mean that the trial court erred
in receiving such evidence. The oil companies challenged the validity of rule 90(b)(2) on
numerous grounds, including several constitutional bases. Such constitutional challenges are not
determined in the same way as a reasoned-justification challenge under section 5(c-1). A
reasoned-justification challenge is essentially a procedural challenge that must logically be
determined from the face of the agency record. (4) A constitutional challenge, on the other hand,
is more substantive in nature and may require evidence not presented to the agency. Thus, in
discussing whether a party who did not participate in the agency's rulemaking proceedings can
nonetheless challenge the validity of the rule, Professor Beal concludes:



 Even if it was determined a non-participant could not assert a lack of
reasoned justification, he or she is not deprived of asserting a general challenge to
the rationality of the rule on a constitutional basis. It has been long held that a
legislative pronouncement can not forestall attack upon the factual basis of a rule. 
However, the issue is no longer one of whether there is evidence and a rationale
stated in the agency's final notice that substantiates the agency action and the
agency should be afforded the general presumption of rationality in fact that is
afforded the Legislature. The contestant can challenge the rule on the sole issue
of whether there is no basis in fact for the action taken. Thus, the legislature may
properly limit the reasoned justification inquiry to the four corners of the final
notice for it does not deprive a non-participant of any right to challenge the rule's
constitutionality.



Beal (I), supra, at 694 (footnotes omitted); see also Ron Beal, Challenging the Factual Basis and
Rationality of a Rule Under APTRA, 45 Baylor L. Rev. 1, 40 (1993) (hereinafter referred to as
"Beal (II)").

 Because the oil companies' attack on the validity of rule 90(b)(2) included
constitutional challenges as well as a reasoned-justification challenge, the trial court did not err
in receiving evidence outside the four corners of the order adopting the rule. Moreover, there is
no indication the trial court considered any of the outside evidence in deciding the reasoned-justification issue. Accordingly, the Commission has not shown that the trial court used the
outside evidence improperly or applied an incorrect standard of review. We overrule point of
error six.



STATUTORY AUTHORITY OF COMMISSION


 In point of error two, the Commission asserts generally that rule 90(b)(2) is within
the Commission's authority to prevent waste and protect correlative rights. In point of error
three, the Commission asserts that rule 90(b)(2) is not inconsistent with other state law. As stated
earlier, one of the recognized grounds for attacking the validity of an administrative rule is that
the agency had no statutory authority to promulgate the rule. See Shannon & Ewbank, supra, at
426-27. It is well established that an agency has no authority to adopt a rule that is inconsistent
with existing state law. Gerst v. Oak Cliff Sav. & Loan Ass'n, 432 S.W.2d 702, 706 (Tex. 1968).

 Conclusion of law six filed by the trial court states: "Statewide Rule 90(b)(2)
violates Section 85.042 of the Natural Resources Code because it is inconsistent with the top rate
of production set by East Texas Field Rule 23 and the Earned Salt Water Allowable Rule of the
East Texas Field Rules." Section 85.042(b) of the Natural Resources Code provides as follows: 
"When necessary, the commission shall make and enforce rules either general in their nature or
applicable to particular fields for the prevention of actual waste of oil or operations in the field
dangerous to life or property." Tex. Nat. Res. Code Ann. § 85.042(b) (West 1993) (the "Code"). 
In its final order, the Commission stated that the primary purposes of the rule were to prevent
waste and protect correlative rights. The order recited that the rule was being promulgated
pursuant to various sections of the Code, including section 85.042, that relate to passage of rules
to prevent waste of oil and protect correlative rights. For example, section 85.202(b) of the Code
provides that "[t]he commission shall do all things necessary for the conservation of oil and gas
and prevention of waste of oil and gas and may adopt other rules and orders as may be necessary
for those purposes."

 The Texas Supreme Court has recently stated that, in determining if an agency had
statutory authority to promulgate a rule, the agency's authority to promulgate rules and regulations



may be expressly conferred on it by statute or implied from other powers and
duties given or imposed by statute. The only requirement is that an agency's rules
must be consistent with the laws of this state. The determining factor . . . whether
. . . a particular administrative agency has exceeded its rule-making powers is that
the rule's provisions must be in harmony with the general objectives of the Act
involved.



Railroad Comm'n v. Lone Star Gas Co., 844 S.W.2d 679, 685 (Tex. 1992) (citations omitted).

 We conclude that rule 90(b)(2) is in harmony with the general objectives of Chapter
85 of the Natural Resources Code, particularly the goals of preventing waste of oil and protecting
correlative rights. Indeed, the oil companies do not seriously contend otherwise. Instead, they
argueand the trial court foundthat rule 90(b)(2) is invalid because it is inconsistent with two
pre-existing rules that govern the maximum amount of oil that operators in the East Texas Field
are allowed to produce. The first of these is East Texas Field Rule 23, which provides that



the owner or operator or manager of each well in the East Texas Field shall be
permitted, either collectively or individually, to produce daily from each well a
maximum of two and thirty-two hundredths (2.32%) per cent of its hourly potential
capacity as determined by the Commission.


PROVIDED FURTHER, That all wells which would not receive as much as
twenty (20) barrels per day when limited to a maximum of two and thirty-two
hundredths (2.32%) per cent of their hourly potential capacity shall be entitled to
produce twenty (20) barrels per day if such wells are capable of producing this
amount of oil.



The second is the ESWA Rule, another East Texas Field rule, which grants a bonus oil allowable
as an incentive to encourage reinjection of water produced from the field.

 The oil companies assert two reasons why rule 90(b)(2) is inconsistent with Field
Rule 23 and the ESWA Rule: (1) the Commission has no authority to promulgate rules that would
vary the provisions of an established rule except through proceedings the specific purpose of
which is to amend or modify the established rule; and (2) section 85.042(b) of the Code does not
allow the Commission to place a rule that is specific to a particular field within a rule that is
statewide in scope. We disagree with both assertions.

 First, we see no compelling reason why the Commission, with its broad discretion
and rulemaking authority, should be prohibited from effectively "amending" one rule by
promulgating a later rule that has the practical effect of modifying the former one. While the
Commission may not promulgate a rule that is inconsistent with an existing state statute, Gerst,
432 S.W.2d at 706, we see no reason to unduly restrict the methods by which the Commission
can amend or modify its own rules, so long as any due-process rights of affected persons are not
infringed. As we conclude below, no such infringement occurred here.

 Second, we do not construe the language of section 85.042(b) requiring the
Commission to "make and enforce rules either general in their nature or applicable to particular
fields" as prohibiting the Commission from promulgating rules that combine both statewide and
field-specific provisions. See Code § 85.042(b) (emphasis added). Such a construction would be
overly restrictive and could unduly hamper the Commission in the exercise of its broad
rulemaking powers. We conclude that rule 90(b)(2) is not inconsistent with Field Rule 23 and the
ESWA Rule in a way that renders it invalid.

 Although the trial court's statutory-authority ground for invalidating rule 90(b)(2)
was based on a perceived inconsistency with existing statutory law, the oil companies also assert
two other arguments why the Commission acted outside its statutory authority in promulgating
the rule. First, the oil companies argue that the rule is invalid because the Commission was
obligated to use contested-case procedures instead of rulemaking procedures. We disagree. The
supreme court has recently decided this issue contrary to the oil companies' position:



 "Unless mandated by statute, the choice by an agency to proceed by general
rule or by ad hoc adjudication is one that lies primarily in the informed discretion
of the agency." . . .


. . . .


 Although the Commission is not required in every instance to utilize
rulemaking over a contested case proceeding, it may exercise "informed
discretion." However, when "an agency faces the alternative of proceeding by
rulemaking or by adjudication, the process of rulemaking should be utilized except
in those cases . . . [when] there is a danger that its use would frustrate the effective
accomplishment of the agency's functions." . . . [W]e conclude that . . . the
Commission is not required to determine questions concerning waste and
discrimination by a contested case proceeding.



Lone Star Gas, 844 S.W.2d at 688-89 (quoting State Bd. of Ins. v. Deffebach, 631 S.W.2d 794,
799 (Tex. App.Austin 1982, writ ref'd n.r.e.)). We see no danger in the present case that the
Commission's use of rulemaking procedures would "frustrate the effective accomplishment" of
the Commission's functions.

 Moreover, the Commission's discretion to use rulemaking to protect correlative
rights, as well as to prevent waste, has long been recognized: "The Railroad Commission is not
confined solely to the prevention of waste but may promulgate field rules applicable to common
reservoirs for the protection of correlative rights." Frost v. Sun Oil Co. (Del.), 560 S.W.2d 467,
477 (Tex. Civ. App.Houston [1st Dist.] 1977, no writ); accord Phillips Petroleum Co. v.
American Trading & Prod. Corp., 361 S.W.2d 942, 945 (Tex. Civ. App.El Paso 1962, writ
ref'd n.r.e.); see also Texaco, Inc. v. Railroad Comm'n, 583 S.W.2d 307, 310 (Tex. 1979);
Railroad Comm'n v. Manziel, 361 S.W.2d 560, 571-72 (Tex. 1962). We conclude, therefore, that
the Commission's use of rulemaking procedures instead of contested-case procedures does not
render rule 90(b)(2) invalid.

 Finally, the oil companies argue that the Commission had no authority to
promulgate rule 90(b)(2) because the rule neither prevents waste nor protects correlative rights. 
This argument, however, appears to us to be simply an attack either on the rule's factual basis or
on its rational relationship to a legitimate state purpose. The appropriate test for a statutory-authority challenge is set forth above: whether the rule is in harmony with the general objectives
of the statute involved. See Lone Star Gas, 844 S.W.2d at 685. A challenge to the factual basis
or rationality of an agency rule may certainly be made, but it should generally not be made as a
challenge to the agency's statutory authority. As we see it, a factual-basis challenge should be
made either (1) as an attack on the adequacy of agency procedure, on the ground that the order
adopting the rule did not set forth reasoned justification of the rule's adoption, including a
restatement of the rule's factual bases, see Beal (I), supra, at 688-91; or (2) as an attack on the
constitutionality of the rule, on the ground that, due to the total incorrectness of its factual basis
or the complete absence of a rational relationship to a legitimate state purpose, it violates due
process, equal protection, or some other constitutionally protected right, see Beal (I), supra, at
696-97. Accordingly, we conclude that the issue of whether rule 90(b)(2) actually prevents waste
or protects correlative rights is subsumed within the oil companies' constitutional challenge, which
will be discussed below.

 We sustain points of error two and three.



COMMISSION PROCEDURE: REASONED JUSTIFICATION


 In point of error four, the Commission complains that the trial court erred in
concluding that rule 90(b)(2) was invalid due to the Commission's failure to comply with the
procedural requirements of APTRA. In conclusion of law four, the trial court concluded that
"Railroad Commission Rule 90(b)(2) was not adopted in substantial compliance with the
Administrative Procedure and Texas Register Act because it lacks a reasoned justification." As
stated earlier, the requirement of a "reasoned justification" comes from section 5(c-1) of APTRA,
which provides in part:



The agency order finally adopting a rule must include:


(1) a reasoned justification of the rule, including a summary of comments
received from parties interested in the rule and showing the names of any
interested group or association offering comment on the rule and whether
they were for or against its adoption, and also including a restatement of the
rule's factual bases and the reasons why the agency disagrees with party
submissions and proposals.



APTRA § 5(c-1) (emphasis added). (5) In the present case, the oil companies do not focus on the
requirement that the order include a summary of comments received, nor on the mandate that the
order state the reasons why the agency disagrees with party submissions and proposals. Rather,
all parties focus on the essential requirement of section 5(c-1) that the agency's order provide the
factual bases and rationality of the rule. Accordingly, in this opinion we will direct our attention
to this disputed issue.

 We have previously adopted some of Professor Beal's analysis of section 5's
reasoned-justification test, in which he concludes that the review is restricted to the four corners
of the agency's final order adopting the rule. He goes on to summarize the test as follows:



Viewing the record as a whole, is there evidence such that reasonable minds could
have reached the conclusion set forth by the agency to justify the action taken. The
only evidence and agency justification to be considered is that set forth in the final
notice prepared by the agency when adopting a rule. The burden is upon the
complaining party to show within the four corners of the final notice an absence
of substantial evidence and that the rule is unreasonable. When there is substantial
evidence to support either a negative or affirmative finding, the rule will be upheld
even though the agency might have arrived at a decision contrary to what the court
might have reached for the court does not substitute judgment for that of the
agency. As to the ultimate policy choice made, the agency need only establish a
reasonable relation to a legitimate statutory purpose and the necessity, desirability
or wisdom of the rule is not within the scope of judicial review.



Beal (I), supra, at 691 (footnote omitted).

 While we agree in substance with the foregoing, we think the reference to the
proper standard as being one of "substantial evidence" is potentially confusing. The substantial-evidence test, whether "pure" or the hybrid "substantial evidence-de novo," has historically been
applied to a formal evidentiary record developed in a quasi-judicial proceeding. As it is currently
fashioned, APTRA provides for the creation of only a minimal "record" in rulemaking
proceedings: the agency order adopting the rule. (6) It would be difficult, if not impossible, to
apply the traditional substantial-evidence test to such a record. We think it more appropriate,
therefore, for a court to apply an "arbitrary and capricious" standard in determining whether an
agency order has substantially complied with the section-5 requirement of stating a "reasoned
justification of the rule . . . including a restatement of the rule's factual bases." Indeed, one
commentary has advocated the application of that standard in all judicial review of agency rules:



[U]se of the arbitrary and capricious test as the yardstick with which to measure
agency rulemaking is more suitable to that particular administrative process than
the substantial evidence test, which was developed for use in reviewing quasi-judicial agency action. In applying such a standard, the courts insist upon an
explanation of the facts and policy concerns relied upon by the agency, determine
whether the agency has considered the relevant factors, and ensure that the agency
has given the problem a "hard look" and engaged in reasoned decisionmaking.



John J. Watkins & Debora S. Beck, Judicial Review of Rulemaking Under the Texas
Administrative Procedure and Texas Register Act, 34 Baylor L. Rev. 1, 32-33 (1982) (footnote
omitted); compare Starr County v. Starr Indus. Servs., Inc., 584 S.W.2d 352, 355-56 (Tex. Civ.
App.Austin 1979, writ ref'd n.r.e.) (explanation of arbitrary-and-capricious standard in
contested-case context); Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665
S.W.2d 446, 454 (Tex. 1984) (in contested-case context, substantial-evidence test and arbitrary-and-capricious test "have many times been considered two sides of the same coin"). Professor
Beal apparently now agrees that a reasoned-justification review should be conducted under an
arbitrary-and-capricious standard. See Beal (II), supra, at 38 n.161. In any event, in the present
case we will review the adequacy of the Commission's "reasoned justification" under an arbitrary-and-capricious test.

 The Commission based its adoption of rule 90(b)(2) on two grounds: prevention
of waste and protection of correlative rights. The portion of the order dealing with protection of
correlative rights sets forth the Commission's rationale as follows:



Correlative rights concerns necessitate an 86% factor for the East Texas Field,
even if the factor were not necessary to prevent waste. Raising the production
factor above 86% would disproportionately increase oil production from areas of
the field that have already produced more than 100% of the original oil in place. 
The 86% factor gives the less capable wells a reasonable opportunity to produce
their fair share of the reserves before those reserves are drained by the more
capable wells. The commission believes that assignment of an 86% factor to the
East Texas Field will result in a reasonable allocation of allowable production
within the field.



Pursuant to section 5(c) of APTRA, the oil companies timely requested an additional statement
of reasons for the Commission's adoption of rule 90, but the statement issued by the Commission
added nothing to what was already in the final order.

 Although the statements in the Commission's order quoted above are somewhat
conclusory in nature, we are not inclined to require a high degree of specificity in such statements,
for the following reasons: First, in the context of judicial review of orders growing out of
contested cases, the Texas Supreme Court has consistently rejected any requirement that the
agency's underlying findings of fact be highly specific, even though section 16(b) of APTRA
expressly requires that such findings be an "explicit" statement of the underlying facts. See Goeke
v. Houston Lighting & Power Co., 797 S.W.2d 12, 14-15 (Tex. 1990); Allied Bank Marble Falls
v. State Banking Bd., 748 S.W.2d 447, 449 (Tex. 1988); Charter Medical, 665 S.W.2d at 452. 
Second, the language of sections 5(c) and 5(c-1) of APTRA do not appear to require as much
specificity as section 16(b): section 5(c) requires only that the agency issue a "concise" statement
of the "principal" reasons for and against the rule, while section 5(c-1) requires only that the
agency's order include a "reasoned justification," including a "restatement of the rule's factual
bases." Third, section 5(e) expressly states that only "substantial compliance" with the
requirements of section 5 is necessary. Finally, we recognize that the rulemaking process is
quasi-legislative in nature, and courts should be especially cautious in construing procedural
requirements. Nonetheless, we agree with Professor Beal that



the test of substantial compliance should not allow an agency to "fill in the blanks"
with meaningless rhetoric and thereby frustrate the legislative intent of reasoned
decision making. The legislative intent undisputably requires a focused analysis
by the agency of all relevant factual, policy and legal issues resulting not only in
a justification, but a reasoned justification of the rule.



Beal (I), supra, at 668 (footnote omitted).

 In support of the trial court's conclusion that the order adopting rule 90(b)(2) did
not contain a reasoned justification of the rule, the oil companies address most of their arguments
to the prevention-of-waste issue; little attention is paid to the Commission's protection-of-correlative-rights explanation. OXY and Mobil, however, do advance a few arguments on this
issue. First, they argue that because the existing Field Rule 23 was designed to protect operators'
correlative rights, "Rule 90 cannot be necessary to protect correlative rights, and if it diverges
from Field Rule 23, it must logically distort such right." We disagree. No one argues that Field
Rule 23 protects correlative rights perfectly. Accordingly, the mere existence of Field Rule 23
does not preclude the Commission from attempting to refine that rule in order, presumably, to
protect such rights even more fully.

 Second, OXY and Mobil attack the Commission's statement that a production factor
higher than 86% "would disproportionately increase oil production from areas of the field that
have already produced more than 100% of the original oil in place." They assert that such a
statement violates the principle that "[i]n determining the parties' correlative rights, the
commission must not consider past production." Texaco Prod., Inc. v. Fortson Oil Co., 798
S.W.2d 622, 625 (Tex. App.Austin 1990, no writ). Even assuming this argument is correct,
however, it does not address the next statement in the Commission's order: "The 86% factor
gives the less capable wells a reasonable opportunity to produce their fair share of the reserves
before those reserves are drained by the more capable wells." When read together with the rest
of the order, this latter statement is, on its face, a reasonable explanation for the necessity of an
86% factor to protect correlative rights.

 In their last two arguments on the issue of the adequacy of the final order's
reasoned justification regarding protection of correlative rights, OXY and Mobil argue: (1) the
evidence showed that an 86% factor actually causes waste, which overrides the Commission's
concerns about correlative rights because the Commission's dominant purpose is to prevent waste;
and (2) the evidence showed that an 86% factor actually impairs correlative rights. In attacking
the factual basis of rule 90(b)(2), however, both of these arguments depend on evidence outside
of the Commission's final order adopting the rule. As we held above, a determination of the
adequacy of the order to satisfy the reasoned-justification requirement of section 5(c-1) is to be
made from the four corners of the order itself. Accordingly, while OXY and Mobil's arguments
may go to the constitutionality of the rule, they may not be considered in deciding the present
procedural question.

 Because the Commission's final order adopting rule 90(b)(2) contains a facially
reasonable explanation of the necessity of the rule to protect correlative rights, and because it
affirmatively appears from this explanation and the remainder of the order that the Commission
considered the relevant factors and engaged in reasoned decisionmaking, we believe the order
fulfills the legislative objectives of section 5(c-1). See Methodist Hosps., 798 S.W.2d at 654. 
Accordingly, we conclude that rule 90(b)(2) is not invalid for failure of the order to state a
reasoned justification of the rule. (7) We sustain point of error four.



CONSTITUTIONALITY


 In point of error five, the Commission complains that the trial court erred in
holding rule 90(b)(2) unconstitutional. In conclusion of law two, the trial court held the rule to
violate several clauses of the Texas and United States Constitutions for the reason that there was
"no substantial evidence to support the Commission's stated purpose in Statewide Rule 90 to
prevent waste and to protect correlative rights."

 We agree in principle that an agency rule is constitutionally infirm when its factual
basis has been conclusively demonstrated to be incorrect. It is unclear, however, what standard
of review is to be applied in determining whether the factual basis has been conclusively
demonstrated to be incorrect. Some Texas cases apparently have held that a rule's factual basis
is to be tested against a substantial-evidence standard. See, e.g., Railroad Comm'n v. Shell Oil
Co., 161 S.W.2d 1022, 1029-30 (Tex. 1942). On the other hand, some cases have held that
agency rules "carry a presumption of the existence of facts justifying the specific exercise of the
legally delegated authority." Texas Liquor Control Bd. v. Attic Club, Inc., 457 S.W.2d 41, 43
(Tex. 1970). For a thorough discussion of the historical application of these inconsistent
standards, see Beal (I), supra, at 678-86.

 The substantial-evidence test is arguably the stricter standard, because it could be
construed to require the agency to come forward with evidence to support the factual basis for its
rule. Under the other test, the "legislative presumption" obviates the need for any supporting
evidence; the needed factual support is provided by the presumption, thus placing all the burden
on the party challenging the rule to conclusively disprove any conceivable factual basis. We need
not determine which standard is the correct one, however, because we conclude that the evidence
supporting the protection-of-correlative-rights basis for rule 90(b)(2) is sufficient to satisfy even
the stricter substantial-evidence test.

 The Commission's expert witness, Michael Locke, and the oil companies' experts
testified regarding both the protection of correlative rights and the prevention of waste as affected
by an 86% production rate and as compared with a 100% production rate. In conclusion of law
three, the trial court concluded that Locke's testimony should be completely disregarded:



The testimony given by Michael Locke, the witness offered by the Railroad
Commission, was not intentionally false testimony. The testimony of Michael
Locke is incredible because it was fully demonstrated by other testimony and
evidence that the data upon which Michael Locke based his testimony were
incomplete and inaccurate and therefore his testimony should be disregarded by the
court.



In support of this conclusion, the oil companies contend that Locke's testimony was so incredible
that it was devoid of any probative value. At oral argument, counsel for one of the oil companies
described Locke's testimony as the equivalent of testimony that "the sun rises in the west." 
Theoretically, we have little doubt that a witness's testimony could be so inherently incredible or
so completely discredited (e.g., by recantation) that it would not be entitled to any probative
weight at all. After a thorough review of the record in this case, however, we are convinced that
Locke's testimony does not present such a situation.

 First, with regard to the protection of correlative rights, Locke testified that at a
100% production factor, as opposed to an 86% factor, the potential for irregular water
encroachment would increase and thereby "hamper" the ability of lower-level marginally
producing wells to recover their proportionate share of the remaining oil reserves. (8) Locke based
his testimony on actual information received regarding production figures on one lease containing
lower-level producing wells in the East Texas Field. Locke compared production figures on this
lease before November 1990, when the production factor for the field was at 86%, with
production figures after November 1990, when the 100% production factor was imposed. Based
on his interpretation of that data, Locke concluded that evidence of irregular water encroachment
was apparent. 

 The oil companies' experts disputed Locke's testimony in two ways. First, John
Casey, one of the oil companies' experts, testified that, based on a reservoir-simulation study of
the East Texas Field, irregular water encroachment was not apparent. Although the reservoir-simulation study may have been more thorough and more comprehensive than Locke's actual field
example, we do not believe Casey's testimony so completely discredited Locke's testimony as to
render it devoid of probative value.

 Second, the oil companies argue that their experts' testimony established that an
86% production rate would actually impair the correlative rights of lower-level producing wells. 
Richard Tink, expert for the oil companies, testified that in a situation such as that in the East
Texas Field where oil reserves migrate from the lower-level wells to higher-level wells, it is
important for those lower-level wells to produce as much as they can while the oil reserves are
flowing under their property. By reducing production to 86%, Tink concluded, the lower-level
producing wells will be able to recover only 86% rather than 100% of the reserves. Tink's
conclusion assumes that the lower-level marginally producing wells could produce the top
allowable number of barrels under a 100% scenario. As indicated above, however, Locke
provided probative testimony that if production were at 100%, the lower-level marginally
producing wells' ability to recover would be hampered by irregular water encroachment. 
Although the oil companies' experts testified that the detrimental effect, if any, on the lower-level
marginally producing wells would be de minimis, we do not believe such evidence established that
Locke's testimony on this issue was so inherently incredible as to be devoid of probative value.

 Based on the above analysis, we conclude that Locke provided probative testimony
that the correlative rights of the lower-level marginally producing wells would be impaired as a
result of allowing a 100% production factor in the East Texas Field. In other words, Locke
provided probative testimony to support the Commission's conclusion that an 86% production
factor would assist in protecting correlative rights. 

 The oil companies next argue that even if the Commission were entitled to conclude
that an 86% production factor would help protect correlative rights, this conclusion would not be
controlling here because (1) prevention of waste is the Commission's dominant purpose; and (2)
the evidence conclusively established that an 86% production factor would not only be ineffective
in preventing waste, but would actually cause waste as compared to a 100% production factor. 
We disagree.

 In the context of the present case, the Commission has a dual purpose: prevention
of waste and protection of correlative rights. Texaco, Inc., 583 S.W.2d at 310. The Commission
may act to achieve either purpose. Although prevention of waste is arguably the dominant
purpose, the Commission may nonetheless legitimately act solely to protect correlative rights, at
least where waste is not implicated. We have concluded above that probative testimony existed
that correlative rights in the East Texas Field would be better protected if an 86% production
factor were imposed. Even if the Commission was not entitled to conclude that prevention of
waste would be achieved under an 86% production factor, we believe it was entitled to impose
this factor to protect correlative rights as long as such factor does not affirmatively cause waste. 
Thus, in order to "override" the correlative-rights basis for the adoption of rule 90(b)(2), it was
the oil companies' burden to establish conclusively that an 86% production factor would cause
waste. 

 The oil companies' experts testified that, as a basic "law of physics," oil production
in the East Texas Field increases as pressure in the reservoir decreases, and vice versa. They
testified that production is better when the field pressure is above the "bubble point" rather than
below it, which in this case is 740 pounds per square inch ("psi"); that optimum production is
achieved at or near the bubble point; that production at a 100% factor instead of 86% would
decrease the field pressure by five psi, from 1089 to 1084; and that this incremental decrease
would thereby enhance recovery and prevent waste. Conversely, the oil companies' experts
testified that reducing the production factor to 86% would increase the field pressure, thus
impairing production and affirmatively causing waste.

 Although Locke accepted and applied the basic "law of physics" identified by the
oil companies' experts, he disagreed with their testimony on two levels. First, Locke testified that
the differential of five psi is "almost within the tolerance of not being able to report five psi on
the pressure gauge unless they are very, very sensitive pressure gauges." In other words, Locke
questioned the accuracy of the oil companies' experts' ability to quantify the field-pressure
differential so precisely as to detect that minute a difference. Second, Locke testified that a field-pressure differential of five psi (from 1089 psi to 1084 psi) is so de minimis that it would be
difficult to accurately determine whether any waste would occur as a result of such a differential. 
The sum of Locke's testimony is that the incremental decrease in field pressure achieved in the
East Texas Field by a 100% production factor as opposed to an 86% production factor, if such
decrease could be quantified at all, would be so small as to make any waste projection
problematic.

 Although Ben Caudle, one of the oil companies' experts, testified that a 100%
production factor "would increase the ultimate recovery to some extent over what it would be at
the 86 percent number," he also admitted that reasonable minds could differ on just what effect
the incremental decrease in field pressure would have on ultimate recovery: "Speculation might
be on exactly how much that [increase in recovery] would be, so we might speculate on the
amount." Therefore, although Locke and the oil companies' experts differed in their conclusions,
we cannot conclude that the testimony offered by the oil companies' experts established that
Locke's testimony on this issue was so inherently incredible as to be devoid of probative value.

 Based on the above analysis, we conclude that Locke provided probative testimony
that an 86% production factor would not affirmatively cause a measurable amount of waste as
compared to a 100% production factor. Accordingly, the oil companies did not conclusively
prove that waste would occur if an 86% production factor were imposed on the East Texas Field. 
Because the oil companies did not conclusively prove that waste would occur, the Commission
was entitled to impose an 86% production factor on the East Texas Field for the sole purpose of
protecting correlative rights. We sustain point of error five.



CONCLUSION


 Having sustained the Commission's points of error two through five, we reverse
the judgment of the trial court, and we declare that rule 90(b)(2) is valid and render judgment that
the oil companies take nothing by their suit.



 J. Woodfin Jones, Justice

[Before Chief Justice Carroll, Justices Jones and Kidd]

Reversed and Rendered

Filed: August 25, 1993

[Publish]

1.   For a discussion of the Commission's proceedings at these Statewide Hearings, see
Kenneth Culp Davis & York Y. Willbern, Administrative Control of Oil Production in Texas,
22 Tex. L. Rev. 149, 165-71 (1944).
2.   The Kelly-Snyder Field is not at issue in this case, because the reservoir is depleted to
the point that the wells in that field are unable to produce above an 86% factor.
3.   Conclusion of law eight expressly stated that "[t]he Court declines to make Findings of
Fact since the only issues presented are issues of law."
4.   We do not mean by this statement to imply that all procedural challenges to an agency
rule must be determined from the face of the agency record. In many instances, that would not
be possible.
5.   Even before section 5(c-1) was added in 1981, section 5(c) of APTRA provided as
follows in part:


On adoption of a rule, the agency, if requested to do so by an interested person
either prior to adoption or within 30 days after adoption, shall issue a concise
statement of the principal reasons for and against its adoption, incorporating in
the statement its reasons for overruling the considerations urged against its
adoption.
6.   Section 5(c-1) does not require that the actual "evidence" on which the agency relied in
promulgating a rule be preserved. Even if preserved, it is problematic whether such evidence
would be admissible in court in a reasoned-justification challenge. That question does not
arise under the circumstances of the present case.
7.   As a result of this conclusion, we need not address the issue of the adequacy of the
order's reasoned justification of rule 90(b)(2) on the ground of prevention of waste.
8.   OXY and Mobil argue that Locke's testimony as to correlative rights must be
disregarded because it was based on a definition of correlative rights as "the equivalent
opportunity to produce." They argue that this definition is erroneous because "it fails to
consider the amount of oil underlying each tract. All operators are not entitled to the same
opportunity to produce. Instead, operators with the natural advantage of greater oil reserves
under their tracts are entitled to produce more oil than operators with lesser reserves." 
Although "the equivalent opportunity to produce" was the short-hand definition adopted by
Locke, his testimony as a whole makes clear he was appropriately referring to correlative
rights in a proportional-recovery sense.